DELACROIX CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 12002. Promulgated November 29, 1949.

*John J. Finnorn, Esq.*, for the petitioner.
*F. S. Gettle, Esq.*, for the respondent.

OPINION.

TYSON, *Judge*: This proceeding involves deficiencies in the amounts of $12,948.41 in income tax and $3,028.16 in declared value excess profits tax determined by respondent against petitioner for the fiscal year ended October 31, 1943.

Questions presented are whether the respondent erred in denying petitioner:

(1) A deduction of $10,589.23 as interest alleged to have accrued during the taxable year on an instrument designated as a promissory note payable to the Hibernia Bank & Trust Co., in Liquidation, and the Interstate Trust & Banking Co., in Liquidation; and

(2) A deduction of $1,432.48 as interest alleged to have accrued during the taxable year on an instrument designated as a promissory note payable to the Canal Bank & Trust Co., in Liquidation;

(3) A deduction of a net operating loss carry-over for each of the fiscal years ended October 31, 1941 and 1942, to the taxable year ended October 31, 1943, based on the claim of petitioner that the respective carry-overs were allowable deductions for each of those two prior years of similar items of interest as those involved in the first and second issues.

As to the third issue, the parties are agreed that, if this Court decides that the items of alleged interest are deductible in the fiscal years ended October 31, 1941, 1942, and 1943, they will settle the amount of the operating loss carry-over in the recomputation under Rule 50.

Further, and in the alternative, if this Court should decide that the claimed interest deductions involved in the first and second issues are not allowable for the taxable year ended October 31, 1943, petitioner assigns error in the respondent's inclusion in petitioner's taxable income of that taxable year the amount of $10,860.91 as representing gross oil royalties accrued to petitioner. With respect to this alternative issue, respondent admits error to the extent of $2,716.60 oil royalty income less statutory depletion, or a net overstatement of income by the amount of $1,969.54 in the deficiency notice.

With respect to each of several other assignments of error which were alleged in the petition and the amendments thereto and which need not be set forth herein, the parties are agreed on the proper adjustments, based on concessions made at the hearing, and settlement in accordance with such agreement will be made in the recomputation under Rule 50.

The proceeding has been submitted upon a stipulation of facts, which is adopted as our findings of fact. The essential facts are summarized herein. The exhibits included in the stipulation embrace numerous written notarized agreements, conveyances, subordinations of mortgages and claims, assignments of royalties, etc., pertaining to certain land owned by petitioner and the mineral rights therein. In addition to certain individuals hereinafter mentioned, those documents involved as parties thereto, *inter alia*, the Delacroix Corporation, hereinafter referred to as petitioner; the Acme Land & Fur Co., a corporation, hereinafter referred to as Acme; the Interstate Trust & Banking Co., in Liquidation, hereinafter referred to as Interstate; the Hibernia Bank & Trust Co., in Liquidation, hereinafter referred to as Hibernia; the Canal Bank & Trust Co., in Liquidation, hereinafter referred to as Canal; and the Whitney National Bank of New Orleans, hereinafter referred to as the Whitney Bank.

The petitioner is a Delaware corporation, doing business and having its principal office in New Orleans, Louisiana, and for the taxable year involved it filed its income tax return with the collector of internal revenue at that city. Petitioner has kept its books and records and filed its returns on the accrual method of accounting and on the basis of a fiscal year ending October 31.

Petitioner owns 109,529.69 acres of property (hereinafter referred to as the property) situated in St. Bernard and Plaquemines Parishes, Louisiana, consisting mostly of marshland crisscrossed by waterways and used primarily for trapping muskrats and other fur-bearing

animals. Prior to 1934 petitioner acquired this land from Acme, the principal stockholder of petitioner, which reserved an undivided fifteen-sixteenths of all oil, gas, salt, and other minerals in the property. On December 22, 1934, Acme conveyed these reserved mineral rights to petitioner and in consideration therefor the latter agreed to pay Acme one-half of all royalties payable to petitioner on account of any production of minerals from the property, after first paying off petitioner's mortgage and vendor's lien indebtedness and other indebtednesses on the property out of any cash and royalties received by petitioner from its contemplated sale of the mineral rights.

By a written instrument dated December 22, 1934, petitioner transferred all the minerals and mineral rights in the property to George B. Conover, his heirs and assigns, the minerals and rights to be free from all encumbrances, taxes, and claims whatsoever, in consideration of $25,000 paid in cash and the vendee's agreement to pay petitioner, its successors, or assigns, a royalty of one-eighth of all oil, gas, or other minerals produced from the property.

By a written instrument dated December 27, 1934, A. Giffen Levy, the owner and holder of 18 promissory notes, all dated August 18, 1926, totaling a principal amount of $240,000, secured by a vendor's lien and mortgage on the property, agreed to subordinate the lien and mortgage securing such notes to, but only to, the rights of Conover and his heirs and assigns in the minerals and mineral rights in the property. In consideration for Levy's act of subordination petitioner and Acme agreed that, as long as any portion of principal, interest, charges, etc., on the 18 notes remained unpaid, 75 per cent of all royalties becoming due and payable to petitioner and Acme under the sale to Conover should be paid to the present or future holder of the notes and, further, Conover was instructed and authorized by petitioner and Acme to pay over and deliver the 75 per cent of the royalties to the Whitney Bank for payment by it to the holder of the notes.

By another written instrument dated December 27, 1934, Interstate, the owner and holder of petitioner's promissory notes in the principal amounts of $30,000 and $250,000, secured by collateral mortgages on the property, and also the owner and holder of tax subrogations in the amount of $19,307.87 on the property, agreed to subordinate such mortgages and tax subrogations securing those notes and claims to, but only to, the rights of Conover and his heirs and assigns in the minerals and mineral rights in the property. In consideration for Interstate's agreement of subordination, petitioner and Acme agreed, in the same written instrument, that so long as the two notes and tax subrogations, whether principal, interest, charges, etc., remained unpaid, 25 per cent of all royalties payable to petitioner and/or Acme under the sale to Conover should be paid to the present or future

holder of the notes and tax subrogations and, further, Conover was instructed, authorized, and empowered by petitioner and Acme to pay over and deliver the 25 per cent royalties to the Whitney Bank for account of the holder of the notes and tax subrogations.

Hibernia held a certificate of participation in certain of petitioner's indebtednesses to Interstate and on December 27, 1934, Hibernia executed an act of ratification of Interstate's act of subordination.

On October 3, 1938, petitioner, Acme, Interstate, and Hibernia entered into a written agreement in pursuance of which: (1) Delacroix and Acme were to concurrently execute and deliver to Interstate and Hibernia an amendment to the agreements of assignment and subrogation of December 27, 1934, so that the rights of Interstate and of Hibernia in and to oil, gas, and mineral royalties in, on, or under the identical property described in the agreements of assignment and subordination "shall be as, and only as, set out in the act of amendment executed this day"; (2) Delacroix and Acme were to concurrently execute and deliver to Interstate and Hibernia a royalty deed covering an undivided one thirty-second royalty interest in all oil, gas, and mineral in or under the identical properties described in the agreements of assignment and subrogation of December 27, 1934, which royalty deed when executed would further secure payment of the note of $132,365.39; and (3) Delacroix was to concurrently execute and deliver an instrument designated as a promissory note, as follows:

$132,365.39 New Orleans, La., October 3rd, 1938.

The undersigned promises to pay to the Interstate Trust & Banking Company, in Liquidation, and the Hibernia Bank & Trust Company, in Liquidation, on or before twenty (20) years after date, the sum of One Hundred Thirty-two Thousand, Three Hundred Sixty-five & 39/100 ($132,365.39) Dollars, with interest at the rate of eight (8%) per cent. per annum from August 27, 1937, until paid, which payment and promise to pay shall be made solely and only out of such funds or property as shall flow from certain assigned oil and mineral royalties which alone secure and are responsible for the payment of this note, and with which assigned oil and mineral royalties this note shall be identified. The payees of this obligation, as well as any assignee of theirs, and all holders hereof, agree that this instrument does not place upon the maker thereof any personal obligation for the payment of all or any portion of the sum hereinabove mentioned or any interest that may be due thereon, and understand fully that this obligation is payable solely and only out of such oil and mineral rights as may be assigned to secure the payment hereof. All oil and mineral royalties are to be applied first on the interest and thereafter in reduction of the principal of this obligation when and as actually received by the holders of this note.

DELACROIX CORPORATION

By: [Signed] MANUEL MOLERO

*President.*

In part pursuance of the above mentioned terms of the agreement of October 3, 1938, petitioner, Acme, Interstate, and Hibernia, on the same date, executed an amendment of the agreements of December 27,

1934. In the amendment recitals were made as to the conveyance of mineral rights to Conover; the acts of subordination by Interstate and Hibernia of the mortgage notes and tax subrogations and the assignment to them of 25 per cent of one-eighth royalties from the property; the fact that all of petitioner's and Acme's indebtedness to Interstate and Hibernia had been reduced to $132,365.39, as evidenced by petitioner's executed note therefor "without novation, but merely for the purpose of creating new evidence of the same indebtedness"; and to the desire of all parties that the December 27, 1934, agreements be amended "so that the assignments created" by those agreements "will secure the aforesaid nonnegotiable promissory note [$132,365.39] executed by Delacroix as new evidence of the indebtedness." Delacroix and Acme agreed that, as long as the $132,365.39 so-called note remained unpaid, 25 per cent of all royalties payable to petitioner or Acme under the sale to Conover should be paid to the present or future holder of the $132,365.39 so-called note and, further, Conover was authorized by petitioner and Acme to pay over the 25 per cent to the Whitney Bank for payment to the holder of the note. Further, in the amendment petitioner and Acme declared and Interstate and Hibernia agreed, *inter alia,* as follows:

* * * that the purpose and intent of this act [the amendment] is to keep in full force and effect in all respects, the assignments and payments of twenty-five per cent (25%) of all royalties * * * to Interstate and Hibernia, except that in lieu of being payable to the holder or holders of the mortgage notes and tax subrogations, hereinabove referred to, that they shall be payable to the holder or holders of the non-negotiable note hereinabove fully set out, * * * until same shall have been fully paid.

In the same amendment Interstate and Hibernia released the assignments of December 27, 1934, "insofar and only as they purported and intended to secure the mortgage notes and tax subrogations," and authorized the recorders of deeds and mortgages to make proper notation on the margins of their respective records. In the same amendment it was acknowledged that the tax subrogations had been released and canceled, that the two mortgage notes [of $30,000 and $250,000, respectively] had been delivered to Acme, and Delacroix, and that Interstate and Hibernia had no further interest in those notes, or either of them.

Also, in further pursuance of the above mentioned terms of the October 3, 1938, agreement, petitioner and Acme, on the same date, executed a royalty deed conveying to Interstate and Hibernia an undivided one thirty-second royalty interest in all oil, gas, and other minerals in and on and produced from the 109,529.69 acres of property, subject to the sale of mineral rights to Conover. The deed further provided that:

* * * the rights herein granted are limited to any future mineral sales and/or leases and/or mineral development by the grantors herein, their successors and assigns, and the herein conveyed rights shall be a charge and burden on the lands hereinabove described and binding only on the grantors herein, and any future owners or lessees of the minerals and/or mineral rights, their successors and assigns. * * *

The deed also provided that in the event of termination of the existing conveyance to Conover the one thirty-second royalties should be paid out of the whole of any oil, gas, or other minerals produced by the grantors, their successors, and assigns. Further, the deed provided that upon payment of the $132,365.39 so-called promissory note in full as to principal and interest, "this contract shall be null and void and the royalty interest herein conveyed and assigned shall revert to the said Grantors herein, or their successors or assigns."

Also, in further pursuance of the above mentioned terms of the October 3, 1938, agreement, Delacroix, on the same date, executed the so-called note as above set out.

Pursuant to an agreement of September 19, 1938, by and among Canal, Acme, and petitioner, the latter's indebtedness to Canal for office rent in the amount of $21,406.05 was reduced to the principal sum of $17,906.05, evidenced by an instrument designated as a promissory note, dated October 3, 1938, whereby petitioner promised to pay Canal on or before ten years after date the sum of $17,906.05, with interest at 8 per cent per annum from September 1, 1937, until paid, and otherwise the note was in terms similar to those contained in petitioner's so-called promissory note to Interstate and Hibernia, as hereinabove fully set out. Also pursuant to the agreement of September 19, 1938, and by written instrument dated October 3, 1938, petitioner and Acme sold and assigned to Canal certain mineral rights and minerals in or on and which may be produced from the 109,529.69-acre property, subject to the conveyance to Conover dated December 22, 1934, and the royalty deed to Interstate and Hibernia dated October 3, 1938, and the instrument further provided that upon payment of the $17,906.05 note in full as to principal and interest "this conveyance shall be null and void and the mineral rights and minerals herein conveyed and assigned shall revert to the said Vendors, or their successors or assigns."

By a mineral deed dated December 27, 1934, Conover transferred his mineral rights in the 109,529.69-acre property to the Texas Co., and oil was first produced on the property and royalties therefrom commenced to accrue on or about August 2, 1942. The State of Louisiana claimed that the oil production was from water bottoms and that it was entitled to the royalties. Such claim was settled by the petitioner, the Texas Co., the State Mineral Board, and others executing, under date of August 21, 1942, an instrument of "unitization" for the production of oil, gas, and other mineral from approxi-

mately 5,000 acres of the property, pursuant to which petitioner was allotted 75 per cent and the State of Louisiana was allotted the remaining 25 per cent of one-eighth of all oil, gas, and other royalties therefrom, and Interstate and Hibernia thereafter executed a ratification thereof.

The 75 per cent of one-eighth royalties on the oil and gas produced from the property which, under the conveyances to Conover and by him to the Texas Co. and under the "unitization" agreement with the State of Louisiana, was allotted to petitioner and Acme and/or their assignees and transferees, was paid to the Whitney Bank, escrow agent, which divided the royalties pursuant to the dedication thereof under the several instruments involved herein, namely, 25 per cent thereof for the account of Interstate and Hibernia for payments on the $132,365.39 note and 75 per cent thereof for the account of Levy for payment of the $240,000 first mortgage notes and thereafter for the account of Canal for payments on the $17,906.05 note, as provided in the heretofore mentioned assignments of royalties. For the period from the commencement of production of oil and gas from the property in August 1942 and for petitioner's fiscal years ended October 31, 1942, to 1947, inclusive, the gross royalties, the severance taxes paid, and the net royalties, as divided by the Whitney Bank, were as follows:

| Period ended Oct. 31— | 25 per cent | | 75 per cent | |
| --- | --- | --- | --- | --- |
| | Gross royalties | Severance taxes paid | Gross royalties | Severance taxes paid |
| 1942 | $333.94 | $27.27 | $1,001.81 | $81.81 |
| 1943 | 2,716.60 | 233.31 | 8,149.82 | 699.93 |
| 1944 | 5,588.99 | 461.99 | 16,766.98 | 1,385.98 |
| 1945 | 8,107.72 | 649.67 | 24,323.16 | 1,949.00 |
| 1946 | 10,955.53 | 805.69 | 32,866.56 | 2,417.06 |
| 1947 | 18,314.37 | 990.23 | 54,943.10 | 2,970.69 |
| Total | 46,017.15 | 3,168.16 | 138,051.43 | 9,504.47 |
| | 3,168.16 | | 9,504.47 | |
| Net royalties | 42,848.99 | | 128,546.96 | |

Entries of payments made on petitioner's so-called $132,365.39 note, bearing 8 per cent interest, payable to Interstate and Hibernia, as recorded on the back of such note, disclose that the first payment was made on March 30, 1946, in the amount of $16,823.08 "on account of accrued interest of within note" and that the total of all payments up to November 15, 1947, all of which were for interest thereon, amounted to $42,848.99, which figure equals the sum of the above mentioned Whitney Bank's 25 per cent division of the net royalties reserved to petitioner and Acme and by them dedicated to the payment of such note by the assignment of royalties to those two banks under the agreement of December 27, 1934, as modified and supplemented by the interested parties' written agreement and assignment both dated October 3, 1938.

The Whitney Bank's above mentioned 75 per cent division of the royalties was dedicated first to the payment of the 18 first mortgage notes, totaling $240,000, held by Levy, pursuant to the assignment of royalties to Levy under agreement with him on December 27, 1934. The division of the net royalties amounted to a total of only $128,546.96 up to October 31, 1947, but it is stipulated that when the royalties so dedicated were sufficient and had been applied in full payment of the notes, the notes and the first mortgage were canceled; however, the obligation under those notes was not made payable solely out of the royalties. After the first mortgage notes were canceled the 75 per cent division of the royalties theretofore payable to Levy became available for payment on petitioner's so-called $17,906.05 promissory note, bearing 8 per cent interest, payable to Canal, pursuant to Canal's agreement with petitioner and Acme dated September 18, 1938, and the latter's sale and assignment to Canal dated October 3, 1938. The entries of payments made on the note held by Canal, as recorded on the back of the note, disclose that all payments thereon were made during August 1947 on account of both principal and accrued interest, the latter amounting to a total of $14,242.56, and the note is marked "Paid in full and Canceled." Under date of September 18, 1947, Canal executed a quitclaim and release of minerals and mineral rights to petitioner and Acme as provided by the terms of the sale and assignment dated October 3, 1938, to Canal.

The deficiency notice with which this proceeding was initiated discloses, *inter alia*, that respondent increased petitioner's reported net income as the result of his disallowance of various claimed deductions, but with respect thereto and as stated at the outset of this opinion, the parties are in agreement as to the proper settlement, in the recomputation to be made under Rule 50, of all assignments of error other than those set out herein as remaining in issue. The deficiency notice further discloses that respondent also increased petitioner's net income as the result of his determination of an item of additional income explained as follows:

(h) You failed to report on your return oil royalty income from the Texas Oil Company in the amount of $6,946.44, computed as follows:

| | | |
|---|---:|---:|
| Gross royalties | | $10,860.91 |
| Less: Severance Tax | $927.72 | |
| Depletion | 2,986.75 | 3,914.47 |
| (27½% of $10,860.91) | | |
| Balance | | 6,946.44 |

The above amount of $10,860.91 gross royalties is approximately the same as the sum of $10,866.42 total gross royalties for petitioner's taxable fiscal year ended October 31, 1943, representing the 75 per cent of one-eighth of the oil and gas produced and reserved under the Conover contract to petitioner and Acme and/or their assignees and transferees.

With respect to such item of additional income determined by respondent, the petitioner assigns error only in the alternative and in the event it is decided herein that petitioner is not entitled to the claimed accrued interest deductions.

The first and second issues herein, respectively, involve the questions of whether respondent erred in failing to allow as deductions for the taxable fiscal year ended October 31, 1943, the respective amounts of (1) $10,589.23 as accrued interest at 8 per cent during the taxable year on petitioner's so-called promissory note for $132,365.39, dated October 3, 1938, payable to Interstate and Hibernia, and (2) $1,432.48 as accrued interest at 8 per cent during the taxable year on petitioner's so-called promissory note for $17,906.05, dated October 3, 1938, payable to Canal. The third issue involves the question of whether similar amounts are deductible as accrued interest for each of the fiscal years ended October 31, 1941 and 1942, for the purpose of determining the amount of petitioner's net operating loss carry-over from each of those two years to the taxable year ended October 31, 1943. As to all three issues, the basic question is whether petitioner had outstanding indebtednesses to those banks and incurred liabilities thereon for accrued interest, under the various agreements and instruments involved and more particularly the so-called promissory notes and the assignments of oil and mineral royalties.

As to these issues, petitioner contends that the respondent erred in not allowing as deductions for that year, the fiscal year ended October 31, 1943, under section 23 (b), Internal Revenue Code,[1] the respective amounts of $10,589.23 and $1,423.48 for interest which accrued at the rate of 8 per cent per annum as a liability of petitioner on its indebtednesses of $132,365.39 to Interstate and Hibernia and $17,906.05 to Canal. Petitioner further contends that similar deductions are likewise allowable for the prior fiscal years ended October 31, 1941 and 1942, for the purpose of determining its net operating loss carry-over.

Petitioner contends that the instruments dated October 3, 1938, the so-called promissory notes payable to the named banks, respectively, evidenced its continuing indebtednesses to those banks, despite the release of petitioner from any personal liability for the payment of either the principal thereof or interest thereon and, further, that the assignments of oil and gas royalties dated October 3, 1938, to those banks, constituted merely pledges of royalty interests by petitioner to its creditor banks as security for its debts.

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions :
  *      *      *      *      *      *      *
  (b) INTEREST.—All interest paid or accrued within the taxable year on indebtedness  *  *  *.

Respondent contends that on October 3, 1938, petitioner's indebted-ness to Interstate and Hibernia and to Canal were wholly discharged and extinguished in a completed and closed transaction consisting of an exchange of unlike properties; that the so-called promissory notes constituted oil payments having specified face values plus additional amounts designated interest at 8 per cent until paid solely out of the proceeds of oil and gas if, as, and when produced from the property; that under petitioner's assignments the banks acquired an economic interest in oil and gas in place; and, further, that since petitioner's indebtednesses to the banks were extinguished on October 3, 1938, no liability for interest thereon could accrue to petitioner subsequent to that date. In the alternative, respondent contends that no payments of interest were actually made on the notes during 1941, 1942, and 1943, and petitioner, not being personally liable, could not accrue interest thereon as a liability in those years and, further, that in any event interest on the notes became due and therefore accrued as a liability of petitioner only if, as, and when oil was produced and to the extent oil royalties became available in the amounts of $333.94 in 1942 and $2,716.60 in 1943 to Interstate and Hibernia and none to Canal prior to 1947.

It is not disputed by the parties that in 1934 petitioner owned the 109,529.69 acres of property, including the oil and gas and other minerals in place, if any, in and under such property; that, under petitioner's conveyance of minerals and mineral rights to Conover in December 1934 for development and exploitation of mineral contents of the land, petitioner reserved to itself a one-eighth royalty interest in oil and gas and other minerals produced from the property (later reduced to a 75 per cent of one-eighth royalty under the unitization agreement with the State of Louisiana) ; and that such reservation constituted an economic interest in the oil and gas in place, carrying with it the right to derive taxable income therefrom and to take deductions for statutory depletion. *Palmer* v. *Bender*, 287 U. S. 551, and *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U. S. 25. Thus there is no question as to the petitioner's owning an oil and mineral royalty interest which could be made the subject of a transfer and conveyance, if the instruments involved herein had the effect of a transfer and conveyance for income tax purposes.

With regard to petitioner's transactions with Interstate and Hibernia, it should be noted, at the outset, that the royalty deed dated October 3, 1938, to those banks was by its terms limited to become operative, so far as concerns the production of oil and gas, only in the future upon the event of a termination of petitioner's conveyance of mineral rights to Conover or its assignees. Since such an event did not occur in any year pertinent here, that royalty deed is im-

material with respect to the issue involving those two banks. Accordingly, the controlling instruments in the Interstate and Hibernia transaction are the petitioner's amended assignment of oil and mineral royalties to those banks and the so-called promissory note to those banks, both dated October 3, 1938. As to the petitioner's transaction with Canal, there was no royalty deed and the controlling instruments are the assignment and so-called note to Canal, also dated October 3, 1938, and of a character similar to those given to Interstate and Hibernia.

The difficulty in arriving at a solution of the basic question of whether petitioner was indebted to Interstate and Hibernia in the taxable year is the apparent conflict as to the intention of the parties as evidenced by the terms of the amended assignment to Interstate and Hibernia and petitioner's so-called promissory note for $132,-365.39. The amended assignment contains statements which would seem to indicate an intention of the parties thereto that the so-called promissory note constituted new evidence of a continuing indebtedness of petitioner in the amount of $132,365.39, with interest at 8 per cent until paid, and that the amended assignment merely secured the payment of principal and interest to the creditor banks by dedicating thereto a portion of petitioner's income which might be derived from oil and mineral royalties. Also, the first portion of the so-called promissory note to Interstate and Hibernia purports to show a promise by petitioner to pay a principal amount within a specified time, plus interest until paid, and the same is true of the so-called promissory note to Canal. On the other hand, petitioner's assignment of October 3, 1938, to Interstate and Hibernia and petitioner's assignment of the same date to Canal purport to evidence transfers and conveyances by petitioner of fractional parts of its oil and mineral royalty interests to the banks in exchange for a release and discharge of petitioner's debts to the banks, for, by the specific terms of the so-called notes given concurrently and in accordance with those assignments, petitioner was released from all obligation to pay any portion of the amounts stated therein, including interest, and the banks were required to look for recovery *solely* out of royalties from oil and minerals, if, as, and when produced from the property.

In resolving the above mentioned conflict as to the meaning of the controlling instruments, dated October 3, 1938, among Interstate, Hibernia, Acme, and petitioner, we conclude that the real intention of the parties and the effect of such instruments were that thereafter Interstate and Hibernia could not look to petitioner for payment of amounts due them, but could look for such payment *solely* to specified royalties from oil and minerals produced from the property for an indefinite period of time; and this conclusion is likewise true as to the

Canal transactions, where no such conflict is involved. The question then is, What interest did the banks acquire under the instruments involved—new evidences of continuing debts of petitioner, collaterally secured by certain royalty interests, as contended by petitioner, or an economic interest in oil and minerals in place in exchange for releasing petitioner from any further obligation on its debts, as contended by respondent?

As previously mentioned, the petitioner under its 1934 contract with Conover reserved an economic interest in oil and minerals in place and, in our opinion, the effect of the transactions under the controlling instruments of October 3, 1938, for Federal tax purposes, was that the banks acquired a fractional portion of such interest from petitioner, since the banks as transferees thereafter could look for recovery of their investment solely to oil royalties, as in *Thomas* v. *Perkins*, 301 U. S. 655, and, thereafter the banks had no right of action against petitioner to collect a debt. Furthermore, the loss or destruction of oil or minerals in place prior to sufficient extraction to provide recoupment by the banks would have resulted in loss to the banks of their investments and not to petitioner, *Palmer* v. *Bender, supra*. Subsequent to those assignments the oil and mineral royalties if, as, and when received by the banks constituted their taxable income.

We hold that petitioner transferred an economic interest in oil and minerals in place to the banks in exchange for the release and discharge of its indebtednesses to those banks, and that on and after October 3, 1938, petitioner was not indebted to Interstate and Hibernia in the amount of $132,365.39 and to Canal in the amount of $17,906.05, and no interest on those amounts accrued as a liability of petitioner in its fiscal years ended October 31, 1941, 1942, and 1943, which holding sustains respondent's determination on the first three issues herein.

Petitioner's alternative issue is that respondent erred in including in its taxable income for 1943 the amount of $10,860.91 as representing gross oil royalties reserved under the Conover contract to petitioner and Acme and/or their assignees. The respondent, in the alternative and if sustained on the first three issues, admits error in overstating petitioner's income by the net amount of $1,969.54 in the deficiency notice based on his inclusion of $2,716.60 representing gross royalties payable to Interstate and Hibernia, less statutory depletion allowed thereon, as a deduction to petitioner. To the extent of that admission, respondent erred in his determination. The balance of the $10,860.91 so included in petitioner's income represents the 75 per cent portion of the royalties payable to Levy pursuant to his December 27, 1934, agreement of subordination of his vendor's lien and first mortgage on the property to, but only to, the mineral rights of Conover in consideration of petitioner's assignment of the royalties to

Levy. Under that transaction Levy acquired additional security for the payment of his first mortgage notes, which remained outstanding and represented a continuing indebtedness of petitioner, primarily secured by the vendor's lien and first mortgage. Under the assignment Levy, in our opinion, acquired not more than an economic advantage in oil and mineral royalties, cf. *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362, and *Helvering* v. *O'Donnell*, 303 U. S. 370; but he did not thereby acquire an economic interest in oil and minerals in place carved out of such interest owned by petitioner. Accordingly, the 75 per cent portion of oil royalties which was payable to Levy constituted taxable income to petitioner, *Anderson* v. *Helvering*, 310 U. S. 404, and *Charles Burke*, 5 T. C. 1167, and that income of petitioner was applied for its benefit to the discharge of its continuing debt. Levy looked to petitioner for the discharge of the latter's debt through use of any funds available to it, *Refiners Production Co.*, 43 B. T. A. 481, 494, and did not look solely to royalties from oil and mineral if, as, and when produced from the property. Further, the facts herein show that the $240,000 first mortgage notes were not paid solely from oil and mineral royalties assigned to Levy, for those royalties totaled only $138,051.43 gross from commencement of production up to October 31, 1947, and the notes were apparently canceled sometime in 1947, the year in which it is stipulated that the royalties became payable and were paid to Canal. Accordingly, we hold that the 75 per cent portion of the royalties paid over to Levy constituted taxable income to petitioner, as determined by respondent.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

———

Disney, *J.*, dissenting: I can not agree with the majority on the question reflected in the first paragraph of the headnote. In my opinion, deduction of accrued interest should have been allowed. The fact that there was no personal liability is immaterial. *New McDermott, Inc.*, 44 B. T. A. 1035; *Louis Schoen*, 30 B. T. A. 1075; *U. S. Fidelity & Guaranty Co.*, 40 B. T. A. 1010; *Koppers Co.*, 3 T. C. 62. The petitioner had and retained the equitable, if not the legal, interest in the property, for when the banks had received the amount due them the contract of October 3, 1938, would become null and void and the royalty interest would revert to the grantor. Regulations 111, section 29.23 (b)–1, provides that "Interest paid by the taxpayer on a mortgage upon real estate of which he is the legal or equitable owner, even though the taxpayer is not directly liable upon the bond or note secured by such mortgage, may be deducted as interest on his indebtedness." If the interest had not been paid, the petitioner would have

lost the property, which is the basic reason for allowing deduction of interest in the cases above cited. No case cited in the majority opinion involves the particular question here involved. The royalty deed was by its terms mere security for the payment of the $132,365.39. Under legal principles too well known to require discussion it, therefore, was a mortgage, with right of redemption. There can be no doubt, I think, that the petitioner could at any time, by the payment of the amount of principal and interest, have required retransfer of the royalty interest. Indeed, the facts found by the majority recite that there was agreement "that, as long as the $132,365.39 so-called note remained unpaid, 25 per cent of all royalties payable to petitioner or Acme under the sale to Conover should be paid to the present or future holder of the $132,365.39 so-called note * * *"—indicating plainly that redemption could have been made at any time. Under these facts, I see here nothing more than legal or equitable ownership of property subject to indebtedness, which bore interest and upon which under the "note" the oil or mineral royalties were first to be applied. The regulation seems to apply squarely, and is not attacked. *Thomas* v. *Perkins*, cited by the majority, is simply to the effect that the assignor of an oil and gas lease in consideration of some cash and oil payments until the full sum is paid, who receives such payment directly from the pipe line companies, is chargeable with the income and the assignee is not. This is in line with *Anderson* v. *Helvering*, 310 U. S. 404, merely to the effect that if a taxpayer purchases oil property under a contract under which he pays part cash and the rest from proceeds of oil and gas produced from the property, the taxpayer to receive the proceeds and bank them to the seller's credit, the seller having nothing but a lien upon the production, the amount paid over to the seller was the income of the taxpayer. *Palmer* v. *Bender* holds, in substance, that if a lessee of oil property sells operating rights in consideration, in part, of payment from the oil produced, he keeps economic rights and, therefore, rights to depletion. I can not apply these cases here, where a bank lends money upon the sole security of property conveyed, but subject to defeasance upon payment. I would allow deduction of the accrued interest. I, therefore, respectfully dissent.