ESTATE OF H. H. WEINERT, DECEASED, JANE W. BLUMBERG, EXECUTRIX, AND HILDA B. WEINERT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56328.    Filed January 30, 1959.

*Leon O. Lewis, Jr., Esq.*, and *Edgar Engelke, Esq.*, for the petitioners.

*Harold A. Chamberlain, Esq.*, and *Robert L. Liken, Esq.*, for the respondent.

OPINION.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' income tax of $817.31 and $4,193.86, for the calendar years 1949 and 1950, respectively. In their petition, petitioners seek a determination that there have been overassessments of $1,399.06 and $7,987.30 for the years 1949 and 1950, although the basis for the claimed overassessments is not clear.

The sole issue raised by the pleadings is whether petitioners were taxable on revenues from their interest in certain oil and gas leases and a recycling plant, received by a trustee under an assignment thereof, in the years 1949 and 1950.

The case was submitted on a stipulation of facts which consisted of certain facts and a number of documents attached thereto or filed at the hearing as exhibits. The facts so stipulated are found as stipulated and the stipulation, together with the exhibits, is incorporated herein by reference.

There is no disagreement between the parties as to the basic facts in this case, but only as to the ultimate tax effect of the various transactions involved.

Petitioners are the Executrix of the Estate of H. H. Weinert, Deceased, and Hilda B. Weinert, widow of the deceased. H. H. Weinert, deceased, and petitioner Hilda B. Weinert were husband and wife, living together at all times pertinent to this proceeding up to the time of his death.

H. H. Weinert, deceased, and petitioner Hilda B. Weinert filed joint income tax returns with the former collector of internal revenue for the first collection district, Austin, Texas, for each of the calendar years 1949 and 1950.

Petitioners kept their books and filed their income tax returns on the cash basis of accounting. All of the business operations of H. H. Weinert, deceased, and petitioner Hilda B. Weinert were conducted for their community estate by the husband, H. H. Weinert.

For many years prior to and during the years involved in this proceeding, H. H. Weinert was engaged in the operation, development, and production of oil and gas properties.

Prior to April 15, 1947, H. H. Weinert and others (hereinafter referred to collectively as petitioner) owned certain oil and gas leases

covering lands in the North Pettus Field, in Goliad and Karnes Counties, Texas.

On or about April 15, 1947, petitioner entered into an agreement (hereinafter referred to as sales agreement) with the Lehman Corporation and Maracaibo Oil Exploration Corporation (hereinafter collectively referred to as Lehman), wherein petitioner agreed to sell and Lehman agreed to buy an undivided one-half interest in the above-mentioned leases insofar as they covered minerals produced from horizons below the base of the Cockfield Zone. The sales agreement also provided that petitioner agreed to sell and Lehman agreed to purchase a $50,000 production payment, payable out of the proceeds from petitioner's retained one-half interest in the oil, gas, and other minerals in and under and that may be produced from the leases above mentioned, and also from the petitioner's interest in the proceeds and revenues from the operation of a recycling plant to be built under the terms of a unitization agreement, hereinafter mentioned. The consideration for the sale of the undivided one-half interest in the oil and gas leases mentioned above and the $50,000 production payment was $100,000 cash, to be paid upon execution of certain other documents referred to therein.

The sales agreement also provided that simultaneously with the execution and delivery of the assignment of the one-half interest in the oil and gas leases and payment of the purchase price therefor, the parties to the sales agreement would enter into a certain "Loan Agreement," and that petitioner would also execute and deliver an "Assignment of Runs and Production Payment" from his remaining one-half interest in said leases.

The sales agreement also specifically stated that it was anticipated that petitioner would enter into certain agreements relating to a proposed plan to pool and unitize said oil and gas leases with certain other oil and gas leases covering lands in the North Pettus Field, and that conveyance from petitioner to Lehman would be subject to any such agreements which may have been executed prior to the date of such assignment.

Prior to the assignment of the one-half interest in said oil and gas leases to Lehman, petitioner entered into six separate agreements affecting said leasehold interests, referred to collectively as the North Pettus operating and unitization agreements, as contemplated in the sales agreement.

The effect of the North Pettus operating and unitization agreements was that petitioner pooled the deep rights in the subject oil and gas leases with other oil and gas leases in the area so that all unitized substances within the unit area and all leases and lands comprising such area, to the extent of unitized substances therein and thereunder, were pooled and unitized as if the said substances and lands had been

included in a single lease. The percentage of participation of each participant in the unit was determined on the basis of acre-feet of effective sand each participant put into the unit.

The parties in the North Pettus unit and the parties in another unit, known as the Burnell unit, joined in an agreement to construct and operate a plant to process unitized substances produced and saved from the two units, the percentage of undivided ownership of each of the parties in the plant to be determined by the ratio of the acre-feet of effective sand contributed by each to the acre-feet of effective sand contributed by all the parties. Unit operators for the two fields and a plant operator for the processing plant were designated.

Under the terms of the several unitization and processing agreements affecting the subject leasehold interests, each party became personally obligated to pay his pro rata part of all costs and expenses incurred in the development and operation of the unit area to the unit operator, as well as his pro rata part of all costs and expenses incurred in the construction and operation of the processing plant to the plant operator.

Each of the parties owning an interest in the recycling and processing plant owned the same interest in the hydrocarbons extracted and saved at the plant as he owned in the plant. However, the agreements contemplated the possible processing of production from leases other than those covered by the unitization agreements in this plant.

On or about October 30, 1947, pursuant to the sales agreement mentioned above, petitioner and others executed three agreements, as follows: (a) An Assignment; (b) a Loan Agreement; and (c) an Assignment of Runs and Production Payment.

The Assignment conveyed to Gas Properties, Inc., a wholly owned subsidiary and nominee of the Lehman Corporation, and Maracaibo an undivided one-half interest in the deep rights in the oil and gas leases mentioned above, subject to the six unitization agreements affecting these leases. Insofar as petitioner is concerned this Assignment, considered in connection with the unitization agreements, conveyed an undivided one-half of his interest in the unitized leases and one-half of petitioner's rights to participate in the ownership of the processing and recycling plant. The Assignment did not mention the $50,000 production payment and the stated consideration was $10 and other valuable considerations.

The Loan Agreement provided that Lehman and Maracaibo would loan and advance to petitioner his pro rata part of the drilling costs and costs of the processing plant and other equipment, provided that the sum of the loans and advances would not exceed $150,000.

The Loan Agreement provided further:

3. The loans and advances referred to above shall be made as and when Weinert, et al, are required to pay their share of the cost of the wells and of the cost of the recycling and processing plant and other equipment, and shall be paid to Weinert, et al, on submission of evidence by them that they have paid the equivalent amount to the Unit Operator of the North Pettus Unit or to the Plant Operator of the processing and recycling plant or, in lieu thereof, at the option of Weinert, et al, and upon written instructions from them to Lehman and Maracaibo, said advancement shall be made by payment of funds directly to said Unit Operator and to said Plant Operator as and when required.

The said Loan Agreement provided further:

4. All of such loans and advances so made by Lehman and Maracaibo to Weinert, et al, shall bear interest at the rate of 2% per annum from the date of the respective loans and advances to the date of payment thereof, and the principal of such loans and advances, together with interest thereon, shall be repaid only out of the net profits arising from Weinert, et al's, interest in the above described leases included in said unit, and out of the net profits arising from the interest of Weinert, et al, in said recycling and processing plant accruing to them or their heirs, legal representatives, or assigns by virtue of their interest in said plant arising from their ownership of the 50% interest in the leases hereinabove described in which Gas Properties and Maracaibo also own a 50% interest.

Petitioner did not at any time sign any notes, obligations, or other evidence of indebtedness whereby he became personally liable to pay or repay any sums of money to Lehman and Maracaibo.

The Assignment of Runs and Production Payment provided that petitioners, for good and valuable consideration, do hereby:

BARGAIN, SELL, TRANSFER, ASSIGN and CONVEY unto Marquis Eaton, Trustee, of San Antonio, Texas, all of their right, title and interest in all oil, gas and other minerals which may be produced and saved from their 50% interest in the above described oil and gas leases in so far as they cover the tracts of land specifically described or referred to hereinabove and in so far as such oil, gas, and other minerals may be produced from sands or reservoirs located below the base of the Yegua (Cockfield) Zone * * *

This agreement also provided that all of the oil, gas, and other minerals, and proceeds thereof and revenues of every kind therefrom to which the assignors may be entitled under the unitization agreements by virtue of their ownership of the undivided one-half interest in the oil and gas leases were also transferred and assigned to the trustee and should be paid and delivered to him.

The Assignment of Runs and Production Payment provided further:

This assignment and conveyance to Marquis Eaton, Trustee, is made for the purpose of securing repayment to The Lehman Corporation and Maracaibo Oil Exploration Corporation of all amounts loaned and advanced, or hereafter loaned or advanced, by them or either of them to the undersigned Assignors, their heirs and assigns, under that certain Loan Agreement this day entered into between said Assignors and the Lehman Corporation and Maracaibo Oil Exploration Corporation, and also for the purpose of conveying to the said

Marquis Eaton, Trustee, for and on behalf of The Lehman Corporation and Maracaibo Oil Exploration Corporation, that certain Production Payment in the amount of $50,000.00 due and payable to them out of the revenues and interests hereby transferred and assigned, after all amounts due under said Loan Agreement have been fully paid * * *

This instrument also provided that it would remain in full force and effect until all such amounts were fully paid.

The Loan Agreement provided that upon receipt of any revenues from interests conveyed by petitioner to him, Marquis Eaton, trustee, should first use such funds to reimburse petitioner for any operating costs, as therein defined, paid by him and applicable to his interest in the leases and properties covered by the agreement, and any excess of revenues over such operating costs should be paid to Lehman and applied first to interest on the advances and loans made by Lehman, and the remaining balance applied on the repayment of the principal of such loans and advances. The operating costs referred to above were to include:

(1) All production taxes and property or ad valorem taxes;

(2) All operation and maintenance charges made by the Unit Operator of the North Pettus Unit and the Plant Operator of the recycling and processing plant;

(3) All royalties payable by Weinert, et al, under their 50% interest in the leases above described; and

(4) All well and plant costs in excess of the limit of $150,000 set forth above, for the advancements and loans to be made by Lehman and Maracaibo to Weinert, et al, hereunder.

The Loan Agreement provided further that upon completion of the repayment of the loans and advances, any further revenue in excess of operating costs should be paid to Lehman and applied to liquidation of the $50,000 production payment purchased by Lehman from petitioner. Upon the full payment of said production payment of $50,000, the trustee should distribute all furthur revenues to petitioner and the trustee and Lehman would execute and deliver to petitioner an instrument reassigning all rights and interests conveyed to said trustee under the Assignment of Runs and Production Payment mentioned above. This agreement also provided that petitioner at his option, and at any time, could repay the balance then due on the principal of the advancements and loans, together with interest thereon, and also pay in full said production payment, out of funds other than the revenues from their interest in the property covered by these agreements.

Pursuant to the terms of the Loan Agreement, Lehman paid out for petitioner's pro rata part of the construction and operating costs the following amounts in the years indicated, and made such payments directly to the unit operator or to the plant operator:

Calendar year 1947:

| | | |
|---|--:|--:|
| Plant equipment | $124. 39 | |
| Plant operating expense | 8. 00 | |
| Lease operating expense | 16. 65 | $149. 04 |

Calendar year 1948:

| | | |
|---|--:|--:|
| Plant equipment | 25, 697. 79 | |
| Lease equipment | 7, 508. 04 | |
| Lease operating expense | 1, 087. 44 | |
| Intangible drilling costs | 15, 186. 94 | 49, 480. 21 |

Calendar year 1949:

| | | |
|---|--:|--:|
| Plant equipment | 29, 370. 51 | |
| Lease equipment | (502. 01) | |
| Lease operating expense | 1, 564. 23 | |
| Plant operating expense | 2, 809. 05 | |
| Intangible drilling costs | (1, 245. 11) | 31, 996. 67 |

Calendar year 1950:

| | | |
|---|--:|--:|
| Plant equipment | 469. 59 | |
| Lease operating expense | 1, 087. 14 | |
| Plant operating expense | 9, 986. 42 | 11, 543. 15 |

Calendar year 1951:

| | | |
|---|--:|--:|
| Lease operating expense | 1, 520. 49 | |
| Plant operating expense | 8, 503. 80 | 10, 024. 29 |

| | | |
|---|--:|--:|
| Total | | 103, 193. 36 |

Pursuant to the provisions of the Loan Agreement and Assignment of Runs and Production Payment, Marquis Eaton, trustee, received the following revenues from the interests conveyed to him by petitioner:

| Calendar year | Leases | Plant | Total |
|---|--:|--:|--:|
| 1947 | (1) | (1) | (1) |
| 1948 | $4, 826. 50 | (1) | $4, 826. 50 |
| 1949 | 4, 094. 47 | $8, 909. 02 | 13, 003. 49 |
| 1950 | 1, 009. 36 | 39, 810. 64 | 40, 820. 00 |
| 1951 | 1, 660. 77 | 43, 862. 11 | 45, 522. 88 |
| Total | 11, 591. 10 | 92, 581. 77 | 104, 172 87 |

[1] None.

Marquis Eaton, trustee, credited the interest conveyed to him by petitioner with the revenues received as shown above, as follows:

| Calendar year | Revenues received | Less interest | Net credit |
|---|--:|--:|--:|
| 1948 | $4, 826. 50 | $334. 54 | $4, 491. 97 |
| 1949 | 13, 003. 49 | 1, 274. 92 | 11, 728. 56 |
| 1950 | 40, 820. 00 | 1, 070. 03 | 39, 749. 97 |
| 1951 | 45, 522. 88 | 402. 45 | 45, 120. 43 |
| Total | 104, 172. 87 | 3, 081. 94 | 101, 090. 93 |

On June 19, 1952, the said Marquis Eaton, trustee, joined by Lehman and Maracaibo, reconveyed petitioner's 50 per cent interest to him, the instrument reciting that Lehman and Maracaibo had been reimbursed in full for all sums expended by them in behalf of said 50 per cent interest and had received in full a certain production payment in the amount of $50,000.

In the preparation of their income tax returns, petitioners reported no income or deductions in any year from the transactions involved in this proceeding except for their share of the $100,000 cash consideration, which they reported in 1947.

Respondent examined petitioners' returns for 1947 and 1948 and made no changes with respect to the reporting of the income and deductions attributable to the transactions involved in this proceeding. The revenue agent's report for these years includes a report of the engineer revenue agent, which contained the following statement:

One transaction appearing in the return for 1947 as sale of leases in Karnes and Goliad Counties should be commented upon. The taxpayer and associates sold to Lehman Corp. and Maracaibo Oil Co. a ½ interest in a block of leases plus an oil payment out of the retained ½ interest in the face amount of $50,000.00, the cash consideration being $100,000.00 to the group, but coupled with a so-called loan agreement by virtue of which Maracaibo & Lehman agreed to advance to Weinert and others up to $150,000.00 of the cost to them, under a cycling and operating contract, of the erection of a cycling plant and the drilling of whatever deep wells were necessary for distillate recovery, this money to be recouped by Maracaibo & Lehman out of, and only out of, an other oil payment for $150,000.00 payable out of Weinert et als retained ½ interest. In actual operation, no such advances were made to Weinert, et al, but their obligations under the cycling and operating agreements were met by Maracaibo & Lehman. This $150,000.00 oil payment was to be senior to the $50,000.00 oil payment first above mentioned, and both are payable out of 100% of Weinert et al's retained ½ interest in the leases.

It is believed that this arrangement is one entered into for the development of the property, and that beyond accounting for the cash consideration, which has been done, no gain or loss results from the various oil payments and advances involved.

In his determination of the deficiencies for the years here involved, the respondent has included in petitioners' gross income for 1949 and 1950 the revenues from production paid to Marquis Eaton, trustee, in those years as shown above, being $13,003.49 and $40,820, respectively, and has allowed certain deductions therefrom, including the interest shown to be credited by the trustee and depletion on the stipulated market value of the unitized substances prior to processing in the plant. This market value was less in each year than the gross income from the sale of the gas and hydrocarbons produced, which income was included by respondent in petitioners' gross income as above mentioned.

The recycling and processing plant was designed to process the unitized substances and casinghead gas produced and saved from the unitized area and to return residue gas into the formation from which produced, less such residue gas as might be sold to others at the plant.

The question for decision is whether the amounts received by the trustee in 1949 and 1950 from taxpayer's retained 50 per cent interest in the oil and gas leases and the processing plant mentioned in the facts recited above and paid over by the trustee to Lehman and Maracaibo, under the terms of the various agreements mentioned, were taxable to petitioner in the years 1949 and 1950.

Respondent determined that the amounts received by the trustee in 1949 and 1950 were constructively received by petitioner and constituted taxable income to him, on the theory that petitioner's retained one-half interest in the oil and gas leases and the revenues therefrom were assigned to the trustee as security for repayment of loans. Alternatively, respondent claims that the assignment at most was an assignment of anticipatory income and therefore the income was taxable to petitioner.

Petitioner claims that the amounts received by the trustee were applied to a production payment previously sold by petitioner and were therefore not taxable income to petitioner, or were receipts of income previously assigned by him to Lehman for a valuable consideration, and hence were taxable to Lehman and not to petitioner. Alternatively, petitioner claims that if any income from this source was taxable to petitioner, only those amounts advanced by Lehman or Maracaibo in the years 1949 and 1950 are taxable in those years, on the theory that those were the only amounts received in the taxable years by this cash basis taxpayer for the assignment of the oil payment.

Neither party argues that there is any distinction between the amounts received by the trustee and applied to repayment of the loans and advances plus interest, and the amounts applied to payment of the $50,000 production payment. Possibly this is because, as hereinafter pointed out, it would appear from the stipulated facts that all amounts received by the trustee during the years here involved, being less than the total amounts advanced by Lehman prior to the end of the year 1950, must have been applied to repayment of the advances and interest thereon under the terms of the Loan Agreement.

What we are concerned with here is whether petitioner is subject to tax on the income received by the trustee, not whether he is taxable on the amounts advanced by Lehman during these years, for reasons hereinafter mentioned.

The essence of the transaction agreed upon and of what was accomplished by the numerous legal documents placed in evidence was that petitioner assigned an interest in property, consisting of his interest in all minerals and revenues produced from the pertinent oil and gas leases and from the recycling plant, to a trustee (1) to secure repayment of loans or advances made by Lehman for petitioner's benefit and (2) to pay Lehman the $50,000 production payment Lehman purchased, or received as a bonus, along with a one-half undivided interest in the leases and plant, for a consideration of $100,000 paid to petitioner in 1947. Thereafter the interest in property reverted to petitioner. The essence of a transaction is determined not by subtleties of draftsmanship but by its total effect. *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, rehearing denied 356 U.S. 964.

We do not think there can be any doubt from the language used in the various agreements between petitioner and Lehman that the parties understood and intended that the amounts advanced by Lehman in payment of costs chargeable to petitioner's retained one-half interest in the oil and gas leases were loans. Nor do we find anything in the actions of the parties or elsewhere in these transactions, as shown in the record, to indicate otherwise. The only question is whether the fact alone that Lehman agreed to look only to the proceeds from the unitization agreement for repayment of his loan changed what was otherwise clearly a loan into a production payment. We do not believe it did.

The original agreement was that Lehman would buy one-half of petitioner's interest in the oil and gas leases to be unitized and a $50,000 production payment from petitioner's retained one-half interest for $100,000 cash. Lehman also agreed to loan petitioner all moneys necessary up to $150,000, to meet petitioner's obligations with respect to the retained interest under the unitization agreement, such advances to be repaid out of the revenues from the retained interest before anything was paid on the production payment.

All of the instruments drawn to carry out this agreement refer to the advances as loans, and to the "Loan Agreement." The precise amount advanced was to be repaid before any amounts were to be paid on the $50,000 production payment, and interest at 2 per cent per annum was to be paid on the net amounts advanced. Petitioner had control of whether these amounts were to be paid to him or to the unit operator. There is nothing to indicate that Lehman assumed liability for any of petitioner's obligations for which these moneys were advanced or that petitioner was relieved of liability therefor, and the amounts paid were used to pay petitioner's share of these costs for which he remained liable. The amount that Lehman was to advance was indefinite, except that it was limited to $150,000.

Lehman actually advanced less than $150,000 and was repaid only the amount advanced, plus interest.

The Assignment of Runs and Production Payment, being the instrument whereby petitioner's retained one-half interest was assigned to the trustee, recites two separate and distinct purposes for which the assignment is made, one being for the purpose of *securing repayment* to Lehman of all amounts loaned and advanced by them *to the assignors*, their heirs, and assigns, under the loan agreement, and the second being for the purpose of *conveying* to the trustee for Lehman the $50,000 production payment.

And the instrument by which the one-half interest was reassigned to petitioner by the trustee, with Lehman joining, recites that Lehman had been *reimbursed in full* for all sums expended by them in behalf of the 50 per cent interest and has *received in full* the $50,000 production payment.

From the above and other language in the various documents, it seems abundantly clear that Lehman was not buying anything with the funds advanced under the loan agreement but was simply lending the money which was to be repaid before anything else. In fact it appears that most of the funds advanced by Lehman were paid for plant equipment and we do not believe there is any claim that Lehman acquired petitioner's interest in that plant equipment.

The only language in any of the agreements which casts any doubt on the conclusion is the statement contained in the Loan Agreement, that—

the principal of such loans and advances, together with interest thereon, shall be repaid only out of the net profits arising from Weinert, et al's, interest in the above described leases included in said Unit, and out of the net profits arising from the interest of Weinert, et al, in said recycling and processing plant * * *

We find nothing in the agreements which states specifically that petitioner was to have no personal liability for repayment of the loans, although it is stipulated that petitioner did not sign any note or other evidence of indebtedness whereby he became personally liable to pay any sums of money to Lehman.

We do not believe the fact alone that the parties agreed that the moneys advanced should be repaid only out of the net profits from petitioner's one-half interest in these leases and the recycling plant is sufficient to convert what was clearly a loan, from the unambiguous language of the written agreements, into a conveyance of an equitable interest in the oil and gas in place, or into an unfettered assignment of the right to future income for a consideration. We do not believe the cases cited by petitioner so hold or require.

In *Delacroix Corporation*, 13 T.C. 827, this Court simply held that, under the rather complicated set of facts there involved, the

effect of the transactions under the controlling instruments was that the assignees acquired an economic interest in oil and minerals in place as a result of which the royalties received by them constituted their taxable income and not taxpayers, and taxpayers could not deduct interest on the so-called notes evidencing the amount of the assignee's economic interest. It is true that the Court relied on the fact that, under the terms of the so-called notes, taxpayer was released from all obligation to pay the amounts specified therein and the assignees were required to look for recovery solely out of the oil royalties if, as, and when produced from the property. But the facts in that case were that, at the time the new agreement was made, taxpayer was already indebted to the assignees, which indebtedness was secured by liens on the property involved, that in order to get someone to operate the property the assignees had to subordinate their lien to the rights conveyed to the operator, and that the assignees accepted assignment of the royalty interest in exchange for releasing taxpayer from personal obligation on the preexisting indebtedness. On those facts, this Court found that the real intent of the parties was to convey to assignees an economic interest in the oil in place and the so-called note was simply evidence of the amount of that interest. As pointed out above, we think the facts here present require a different conclusion as to the intent of the parties and the effect of the documents and the mere fact that Lehman agreed that the loans should be repaid only out of the revenues from the unitization agreement does not change the situation.

Here, the trust form of transaction appears to have been used deliberately to preserve the distinction between the advances or loans and the production payment. Nothing was conveyed or assigned directly to Lehman. Legal title was placed in the trustee and the income was received by him in behalf of the beneficial owner thereof as determinded from the Loan Agreement. The revenues received by the trustee were first to be applied to repayment of funds which petitioner requested Lehman to advance for him to pay his pro rata share of the costs of drilling and building the processing plant. The object of the transaction was for Lehman to advance cash for petitioner's use and benefit until such time as the revenues from petitioner's interest made such cash available to petitioner. The evidence indicates that at the time this was done there was little, if any, question that those revenues would be sufficient in a relatively short time to repay Lehman in full, plus interest. The first revenues received by the trustee were received for petitioner's use and benefit and the agreements simply specified how they were to be applied.

In *Manahan Oil Co.*, 8 T.C. 1159, also relied upon by petitioner, this Court held that under agreements whereby fractional working interests in oil and gas leases were temporarily assigned to taxpayer to

reimburse it for its expenditures in drilling and developing the property, the income received by taxpayer from such source was taxable to it. There was nothing to indicate that taxpayer was simply loaning or advancing funds for the assignor.

Petitioner also relies on *Commissioner* v. *Caldwell Oil Corporation*, 141 F. 2d 559 (C.A. 5), affirming 47 B.T.A. 707. There, the owner of the working interest in a lease formed taxpayer corporation, in which he owned all but 2 qualifying shares, and transferred the lease to it for a $7,000 note of taxpayer and his agreement to advance the funds for drilling wells, for the return of which he agreed to look only to the proceeds of oil, if, as, and when produced. Taxpayer executed an assignment to the stockholder of all the proceeds of the working interest in the wells, after deducting actual operating expenses, until the proceeds repaid stockholder the specific amount he had paid out for drilling wells, plus interest. Both the Board of Tax Appeals and the Court of Appeals for the Fifth Circuit held that the assignment gave stockholder an economic interest in the oil in place until his outlay was returned to him because he stood to be reimbursed only if oil was produced. But, as stated by the Board of Tax Appeals in its opinion, page 713:

In reality, petitioner retained no interest in the oil in place, but had only a reversionary interest to come back to it when and after Caldwell's right was exhausted. * * * Under the facts it appears that petitioner was no more than an agent of Caldwell, its chief stockholder, to operate the lease. * * *

In this case there is no suggestion that petitioner was acting in behalf of Lehman and it is clear that petitioner intended to retain his full 50 per cent interest in the project, subject only to the $50,000 production payment carved out of it. Use of the revenues from it to repay the advances made by Lehman for his account was simply a charge on that income of petitioner's if he did not repay the advances with other funds. And in the *Caldwell* case, the corporation made an outright assignment of the proceeds of its working interest in the lease direct to Caldwell, Caldwell became directly responsible to the drilling contractors for the costs incurred, and, as pointed out in the Board of Tax Appeals' opinion, Caldwell was not limited to the corporation's "net profits" for recovery of his payment; while in this case petitioner's interest was assigned to a trustee, for the purpose of securing repayment of a loan. Lehman assumed no obligation to anyone except to loan money to or advance money for petitioner, and the loans were to be repaid out of the "net profits" from petitioner's interest in the leases and recycling plant.

Petitioner also relies on *Gilcrease Oil Co.*, 6 T.C. 548. There the taxpayer corporation bought some of its stock from two of its stockholders. In payment therefor taxpayer assigned a certain percentage

of its interest in the net proceeds of a certain oil and gas lease for a period of 20 years. While the agreements did state that the assignments were to be made as "security" for payment of the sums specified therein they also provided that assignee would lose if the percentages did not equal the specified sums in the 20-year period but would also take any excess over those sums produced in that period. This Court held that under the facts the assignee received an economic interest in the oil and gas in place and the income from the percentage assigned was not taxable to the assignor. The Court emphasized that the assignees were entitled to the "net proceeds" of the oil and gas produced, rather than "net profits" and that the amount assigned was not a stated amount but all the revenues over a 20-year period. We do not think that case is similar to the security assignment here under consideration where the property interest was assigned to a trustee to repay from net profits in a relatively short time a specified amount loaned to petitioner. We have been cited no case wherein we find the factual situation to be sufficiently similar to the facts here to be controlling.

In our opinion, under the facts in this case, Lehman did not acquire the equitable interest in the oil and gas in place by virtue of these advances. The funds advanced were used to meet petitioner's obligation for his pro rata share of the drilling and recycling plant costs. They were not used to pay any part of Lehman's pro rata share of these costs. Lehman did not acquire any interest in the product of these expenditures and they were not made for Lehman's direct benefit. The funds advanced were used to provide a direct economic benefit to petitioner, being used to pay his obligations under the unitization agreements. Lehman acquired nothing for these advances except the right to be repaid, first, with interest, from the proceeds of petitioner's retained interest in the leases. The equitable interest in the proceeds assigned, insofar as they were used to repay these advances and interest, remained in petitioner. He assigned these proceeds, in trust, as security for the repayment of the loans. Even though petitioner may have had no personal obligation to repay the loans, the income from the pledged property having been received and used by the trustee to repay the loans and thus release the property and future income therefrom to petitioner, the income was received for the economic benefit of petitioner and was taxable to him. *Anderson* v. *Helvering*, 310 U.S. 404; *Helvering* v. *Horst*, 311 U.S. 112; *Commissioner* v. *Slagter*, 238 F. 2d 901 (C.A. 7, 1956), reversing 24 T.C. 935.

The facts in this case distinguish it from *Carl A. Prater*, 30 T.C. 1262, on appeal (C.A. 5, 1958), wherein the petitioner had no obligation to pay any of the drilling and development expenses for the reimburse-

ment of which the oil payment was reserved and wherein there was no semblance of a loan to petitioner. Nor is this case inconsistent with the result reached by this Court in the recent case of *Myrtle J. Wood*, 31 T.C. 528, although a statement in that opinion might suggest a different conclusion where the creditor must look solely to the oil production for recovery of his advances. That statement was not necessary to the conclusion in that case, and we will not apply it to the facts here involved.

We do not agree with petitioner's alternative contention that only so much of the income as equaled advancements actually made by Lehman and Maracaibo during 1949 and 1950 should be taxable to petitioner in those years. These payments did not represent the purchase price of an assignment of an oil and gas interest. They represented loans to or advances for petitioner. It is the income received by the trustee and the purpose for which it is received with which we are concerned.

Under the above conclusions, until such time as the entire amount of the advances and interest thereon was paid to Lehman, the trustee was receiving the income from petitioner's retained one-half interest in the leases for or for the use of petitioner, and such income was taxable to petitioner. From the accounting made as part of the stipulation of facts filed herein, it appears that all of the receipts of the trustee during the years 1949 and 1950 would have had to be applied, under the agreements, to payment of interest on the loans and repayment of principal thereof. By the end of 1950 the advances made by Lehman totaled about $93,000 while the total revenues received by the trustee up to the end of 1950 totaled only a little less than $59,000, and the trustee credited the interest conveyed to him by petitioner with a net amount of about $56,000. This being the case, we are not concerned in the years here involved with income received by the trustee and applied to payment of the $50,-000 production payment. Consequently we hold that all income received by the trustee during 1949 and 1950 is taxable as ordinary income to petitioner, subject, of course, to depletion and other expense properly chargeable thereto. Petitioner having raised no questions with reference to respondent's allowance of depletion and other expenses, decision will be entered for respondent.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

TRAIN, J., concurring: I agree with the result reached in the majority opinion because, under the terms of the agreement involved in this case, the petitioner clearly retained the economic interest in the oil and gas.

It is true that Weinert did not assume personal liability for the loan in question. However, the terms of the loan agreement provided that Lehman was to look for the recovery of the loan to the *net profits* arising from oil and gas production and to the *net profits from the recycling and processing plant*. In my opinion, such a right of recovery is not limited to and is substantially broader than a right of recovery only out of mineral production. Therefore, since Lehman's right of recovery did not depend solely on the oil and gas production, Lehman did not possess the economic interest in the minerals in place. *Anderson* v. *Helvering*, 310 U.S. 404 (1940).

The majority opinion refers to our recent decision in *Myrtle J. Wood*, 31 T.C. 528 (1958), with the comment "that a statement in that opinion might suggest a different conclusion" than that reached in the instant case "where the creditor must look solely to the oil production for recovery of his advances." The majority opinion then continues: "That statement was not necessary to the conclusion of that case, and we will not apply to the facts here." The statement in *Myrtle J. Wood*, *supra*, referred to by the majority is apparently the following:

If the right of recovery had extended solely to the oil production, the Withers estate would have held the economic interest in the 45 per cent interest of the community estate, and would receive ordinary income from that interest as long as the receipts were applied to its advances. *Thomas* v. *Perkins*, 301 U.S. 655 (1937).

Granting that the above statement may not have been essential to our decision of the *Wood* case, I am disturbed by the clear inference in the instant opinion that the quoted language may be an incorrect statement of the law and, thus, is not to be followed here. I would have thought it well settled that, where an individual's right of recovery extends only to the mineral production, he is the owner of an economic interest in the minerals in place and is taxable on the income allocable to that interest and is likewise entitled to an allowance for percentage depletion.

I understand the allowance for percentage depletion to be a provision, arbitrary in measure, for the recovery of capital where the capital is at the risk of mineral production. See *Palmer* v. *Bender*, 287 U.S. 551 (1933) and *Thomas* v. *Perkins*, 301 U.S. 655 (1937). It is upon this fundamental principle that the rule stated above is based, namely, that, if the advancer of moneys can look only to mineral production for his recovery of those moneys then his capital is at the risk of that mineral production and he is entitled to percentage depletion. Moreover, while it is true that the "economic interest" question arises with regard to the allocation of the right to percentage depletion rather than to the allocation of income proper, certainly

the two issues are inseparable in the field of oil and gas taxation and the one must follow the other.

The majority's difficulty with the language quoted from the *Wood* case is due apparently to its conclusion that Lehman's right of recovery was limited solely to oil production. If that conclusion were correct under the facts of this case, then the rule stated in the earlier case, if accepted as valid, would require a different result than that reached here. However, as I have pointed out, I believe that that conclusion is erroneous and that Lehman's right of recovery was not so limited. This being the case, the petitioner cannot shift to Lehman the income involved. This approach reaches the identical result as does the majority opinion and does so without casting doubt on a fundamental principle of long standing.

MULRONEY and FORRESTER, *JJ.*, agree with this concurring opinion.