108 T.C. No. 13

UNITED STATES TAX COURT

ESTATE OF LEON ISRAEL, JR., DECEASED,
BARRY W. GRAY, EXECUTOR, AND AUDREY H. ISRAEL, Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

JONATHAN P. WOLFF AND MARGARET A. WOLFF, Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 31588-88, 13142-89.          Filed April 1, 1997.

<u>Held</u>:  Fees paid in connection with "cancellation"
of legs of commodity forward contracts treated as
capital losses, not ordinary losses.  The opinion of
the U.S. Court of Appeals for the District of Columbia
Circuit in <u>Stoller v. Commissioner</u>, 994 F.2d 855 (D.C.
Cir. 1993) (in its treatment of losses from
cancellation and replacement, and cancellation and
termination, of legs of commodity forward contracts as
ordinary losses) not followed, and our opinion in
<u>Stoller v. Commissioner</u>, T.C. Memo. 1990-659, affd. in
part and revd. in part 994 F.2d 855 (D.C. Cir. 1993)
(in its treatment of losses from cancellation and
termination of legs of commodity forward contracts as
ordinary losses), modified.

Herbert Stoller and William L. Bricker, Jr., for petitioners.*

Steven R. Guest, Mark J. Miller, and Edward G. Langer, for respondent.

OPINION

SWIFT, Judge:  Respondent determined deficiencies in petitioners' Federal income taxes and increased interest as follows:

Estate of Leon Israel, Jr., Deceased, and Audrey H. Israel

| Year | Deficiency | Increased Interest Sec. 6621(c) |
|------|-----------|--------------------------------|
| 1977 | $ 9,837 | * |
| 1979 | 14,442 | * |
| 1980 | 62,482 | * |

* 120 percent of interest accruing after Dec. 31, 1984, on portion of the underpayment attributable to a tax-motivated transaction.

Jonathan P. and Margaret A. Wolff

| Year | Deficiency | Increased Interest Sec. 6621(c) |
|------|-----------|--------------------------------|
| 1979 | $55,114 | * |
| 1980 | 82,369 | * |
| 1981 | 2,294 | * |

---

* Briefs amicus curiae were filed by Joel E. Miller as attorney for Allan D. Yasnyi, Martin B. Boorstein, and Marilyn G. Boorstein, and by Eli Blumenfeld as attorney for Lesley Yasnyi, other partners against whom respondent has determined income tax deficiencies relating to the same issue involved herein. These other partners have filed petitions in this Court, and they have filed stipulations to be bound by the final resolution of the instant cases.

  *  120 percent of interest accruing after Dec. 31,
   1984, on portion of the underpayment attributable
   to a tax-motivated transaction.
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After settlement, the sole issue for decision is whether losses incurred in connection with closing forward contracts in Government securities should be treated as capital losses or as ordinary losses.

The parties submitted these consolidated cases fully stipulated under Rule 122. More specifically, as factual evidence in these cases, the parties stipulated the admissibility of the entire trial record of Stoller v. Commissioner, T.C. Memo. 1990-659, 60 T.C.M. (CCH) 1554, 1990 T.C.M. (P-H) par. 90,659, affd. in part and revd. in part 994 F.2d 855 (D.C. Cir. 1993). That case involved Herbert Stoller (Stoller), petitioners' counsel in the instant cases and also a partner in Holly Trading Associates (Holly), a partnership in which Leon Israel, Jr. (Israel), Jonathan P. Wolff (Wolff), and other petitioners herein also invested, and the treatment, for Federal income tax purposes, of the identical losses of Holly relating to the same forward contracts that are at issue in the instant cases. A number of additional issues that were addressed in Stoller v. Commissioner, supra, are not at issue herein.

We expressly incorporate into our findings of fact the background facts relating to Holly's investments in forward contracts and commodity straddle transactions as well as the specific facts relating to the particular commodity forward contracts that are at issue herein as those facts were found in our opinion in Stoller v. Commissioner, supra, with one exception as to the ultimate finding of fact that we made in our Stoller opinion with regard to the tax treatment of the losses incurred on the commodity forward contracts that were closed by cancellation and termination as explained further below.

We also attach hereto and incorporate into our findings of fact as Appendixes A-1 and A-2, certain schedules that were attached to our opinion in Stoller v. Commissioner, 60 T.C.M. (CCH) at 1569-1571, 1990 T.C.M. (P-H) at 90-3223 to 90-3227. (We note that Appendixes A-1 and A-2 attached hereto were labeled Appendixes B-1 and B-2 in our above Stoller opinion.) These schedules, among other data, set out data relating to the three groups of forward contracts that are at issue in the instant cases.

The schedule below identifies lines of Appendixes A-1 and A-2 that reflect specific information with regard to each of the three groups of forward contracts in issue and the amount of the losses claimed by Holly with respect thereto:

| Transaction & Losses<br>Claimed | Appendixes A-1 and A-2 Line Nos. |
| --- | --- |
| First Contracts  -- ($837,500) | A-1, Lines 5, 7, 9, 11, 17-24, 26, 28 |
| Second Contracts -- ($816,219) | A-2, Lines 1, 3, 5, 7-12, 24-26, 29, 30 |
| Third Contracts  -- ( $10,000) | A-2, Lines 13-20 |

The opinion of the U.S. Court of Appeals for the District of Columbia Circuit in Stoller v. Commissioner, supra, provides only an abbreviated explanation of the particular forward contracts that were the subject of the appeal of our opinion in Stoller v. Commissioner, supra, and that are at issue herein.

We also, in light of the essentially legal nature of the issue before us, set forth herein a somewhat abbreviated explanation of the details of the particular forward contracts that are at issue, but we emphasize particular aspects of these forward contracts, the significance of which appears to have been overlooked by the Court of Appeals in its analysis and opinion in Stoller v. Commissioner, supra.

We believe that the aspects of these transactions that we emphasize herein are significant and determinative of the narrow issue before us (namely, whether the losses in question are deductible as capital or as ordinary losses). We also note that respondent has conceded the increased interest under section 6621(c) and makes no contention herein that the forward contracts at issue were sham transactions or lacked a business purpose or profit motive. Further, no issue is raised as to petitioners' cost basis in the forward contracts in question.

As indicated, from 1979 to 1982, Israel, Wolff, Stoller, and other individuals were partners in Holly, which partnership invested nominally in interest-bearing Government securities, such as U.S. Treasury Bonds (T-Bonds) and Government National Mortgage Association Bonds (GNMA's) by way of unregulated commodity forward contracts.

Holly utilized forward contracts to conduct an arbitrage program involving the simultaneous purchase in one market and sale in another market with the expectation of making a profit on price differences in the different markets. Holly's program involved the establishment of long positions in Government securities and the simultaneous establishment of short positions in different Government securities, with a difference in the interest rates, or repurchase rates, on the two positions that was calculated to yield a nominal net profit to Holly when the positions were liquidated.

In this instance, a long position represents a contract to purchase a Government security in the future, and a short position represents a contract to sell a Government security in the future. The establishment of both long and short positions in the same type of commodity is called a spread or a straddle.

In the minds of the partners of Holly, in actuality and in substance, Holly's investments in commodity forward contracts involved nothing more than contracts to speculate in or to

arbitrage -- for the short length of time that the forward contracts remained outstanding -- changes or shifts in the interest and discount rates associated with the particular type of Government securities to which the forward contracts were pegged. By entering into offsetting forward contracts to purchase and to sell these Government securities, Holly effectively created synthetic short-term security investments by means of the straddles, even though the underlying Government securities to which the interest rate speculation was pegged constituted long-term Government securities.

For example, by entering into a contract to purchase, at the current market or other specified price, 15-year T-Bonds for delivery in 3 months and simultaneously entering into a contract to sell, at the current market or other specified price, 15-year T-Bonds for delivery 6 months later, Holly "created" the economic equivalent of a contract to purchase a 6-month T-Bond. Holly then arbitraged these contracts against simultaneous contracts to sell GNMA's on the same specified date in 3 months and to purchase GNMA's 6 months later.

In economic terms, and as between the parties, the only important factors in such a straddle transaction are the initially specified price differential between the legs of the forward contracts or straddle and changes in interest and discount rates associated with the particular Government

securities to which the contracts are pegged that occur during the period of time that the contracts remain outstanding. Those factors will determine the entire net gain or loss whenever the position is settled or closed out.

No actual purchase or sale of the Government securities to which the forward contracts are pegged is ever contemplated. In fact, no specific Government securities are identified as being associated with the forward contracts. In actuality, the Government securities to which the forward contracts are associated are more accurately described as hypothetical Government securities that, if they existed, would have the same interest rates and other features as the type of Government securities to which the forward contracts are pegged.

Pricing of the forward contracts entered into by Holly occurred in the following manner. Mr. Wolff, on behalf of Holly, negotiated with ACLI Government Securities, Inc. (AGS), a dealer in Government securities and a broker of commodity futures contracts, the price differential -- as of the date the contracts were entered into -- between the long and short positions of each straddle and, once that differential was agreed upon, left it to AGS to assign prices to the two legs of the straddle reflecting the initial price differential agreed upon. When Mr. Wolff negotiated with AGS regarding offsetting positions, again he would negotiate with AGS only the price differential as of the date the offsetting contracts were entered into.

In the context of the straddle transactions of the type involved in these cases, commodity forward contracts (as with futures commodity contracts) are not consummated by actual sale or purchase and delivery of the underlying securities or commodity.  Actual delivery of the underlying securities is not contemplated.  Rather, forward contracts are generally closed by offset, that is by entering into opposite forward contracts in the same commodity with the same or similar settlement dates.  When such opposite forward contracts in the same commodity are entered into, the rights and obligations of the investor in the initial contracts are simply regarded as terminated.

The parties agree that in the above situation the termination by offset of the investor's respective positions constitutes a capital transaction.  We emphasize that all that has happened in closing the transaction by way of offset is that the investor (at whatever time during the length of the contract the investor chooses to terminate or lock in the gain or loss that has occurred with respect thereto as a result of changes in the price differential and in interest and discount rates relating to the relevant Government securities from the day the forward contracts were first entered into until the day the contracts are closed) simply notifies the other party of the investor's desire to close the transaction by offset and, in effect, the contracts or positions are terminated as of that point in time.

Occasionally, an investor may wish to terminate or "lock in" the gain or loss on only a particular leg of a commodity forward contract or straddle. The procedure is essentially the same, and the transaction is essentially the same, regardless of which of a number of available methods is utilized to lock in the gain or loss on a particular leg of a commodity straddle transaction that has occurred up until that point in time.

True cancellations of forward contracts, where the transaction or contracts are vitiated ab initio, only occur when forward contracts contain errors.

When interest rates change at any time during the period of time that forward contracts are open, the value of the straddle increases or decreases, but that increase or decrease is moderated by the fact that as one leg of the straddle increases in value, the other leg decreases in value by a similar amount. Although the change in value of a given straddle remains fairly constant, one particular leg of a straddle may reflect a large loss and the other leg may reflect a large gain when interest rates fluctuate widely and when the other leg of the straddle is not considered. It was at such a point in time that Holly, for income tax purposes, occasionally would close by offset or by "cancellation" only a loss leg of a straddle and simultaneously replace the loss leg with a new contract for a slightly different delivery date, thereby locking in the loss on the first leg and the gain on the second leg of the straddle that had occurred from

the day the contracts had initially been entered into until the day the initial loss leg of the contract is closed.

In the above scenario, when the loss leg is closed by "cancellation" and simultaneously replaced with a new forward contract, the purpose of going through the formality of "canceling" the loss leg of the forward contract and replacing it (instead of directly "offsetting" the loss leg) was to attempt to convert the capital loss that petitioners concede would have been associated with the offset procedure into an ordinary loss that Holly claims is associated with a "cancellation."

When a loss leg of a straddle is closed by cancellation and terminated (i.e., no replacement or offset contract is purchased), as well as when a loss leg of a straddle is closed and a replacement contract is purchased (as distinguished from closing by offset), the loss leg of the contract is closed or terminated as of the date of the closing, and the parties have effectively locked in the "loss" on that leg of the straddle, reflecting simply the change, due to shifts in the interest rates, in the nominal value of that leg from the day the leg was entered into until the day of the closing of the leg.

When Holly closed a loss leg of a straddle and no replacement or offset contract was purchased, Holly paid AGS what was referred to as a "cancellation" fee equal to and representing the loss that had been realized on just that leg of the straddle.

When Holly closed a loss leg and replaced it, Holly also

paid AGS a "cancellation" fee equal to and representing the loss that had been realized on just that leg of the straddle (and without taking into account the offsetting gain that also was realized and locked in as of that point in time via the replacement leg of the straddle), which cancellation fee represented the loss realized on the loss leg that was closed.

The closing or liquidation of loss legs of forward contracts by way of offset or by way of "cancellation" (and whether or not "cancellation" is followed by replacement contracts) is economically the same.  Where "cancellation" of loss legs is followed by replacement contracts, the replacement contracts simply serve to lock in the offsetting gain on other legs of the straddle that has occurred from the day the straddle was first entered into until the day the loss legs are closed.  The replacement contracts simply relate to the need to lock in the large gain in order to offset the large loss that is going to be claimed for tax purposes.  The replacement contracts in no way alter the character of the loss realized on the legs that are closed.

Holly typically, in the following year, closed the gain legs of the straddle transactions by offset in order to qualify the gain as capital gain.

The so-called cancellation fees that were due on closing the loss legs of forward contracts (at least with regard to the first and second groups of forward contracts in issue) were not paid by

13

Holly at the time the investors' loss positions were locked in. Mere bookkeeping entries were made to reflect the so-called cancellation fees.

Just prior to the end of each year, the individual partners of Holly obtained bank loans and made contributions to their partnership capital accounts in Holly in amounts sufficient to pay the cancellation fees owed by Holly. Holly then used such funds to pay the cancellation fees to AGS and treated the fees as ordinary losses at the partnership level and passed through the claimed ordinary losses to the individual partners.

Just after the first of each year, AGS paid to Holly an amount essentially equivalent to the cancellation fees that Holly had paid AGS at the end of the prior year -- reflecting the gains that were locked in on the straddle transactions. Holly then distributed these funds to the individual partners as a return of capital, and the partners used these funds to repay their bank loans approximately 1 to 2 weeks after having been loaned the funds.

On its Federal income tax returns for the years in issue, Holly treated losses arising from forward contracts closed by offset as capital losses. Holly, however, reported losses arising from forward contracts closed by "cancellation" (regardless of whether or not replacement contracts were purchased) as ordinary losses.

In 1979, Holly reported a capital gain of $1,875 from trading in commodity forward contracts and an ordinary loss of $837,500 relating to the "cancellation" of the first group of forward contracts in issue.

In 1980, Holly reported capital gains in the amount of $850,000 (relating to the straddle the above loss leg of which was closed in 1979 to produce the $837,500 loss claimed in 1979) and an ordinary loss of $826,219 relating to "cancellation" of the second and third forward contracts in issue that were "canceled" in 1980 (an $816,219 loss relating to the second group of forward contracts closed by "cancellation" and replacement, and a $10,000 loss relating to the forward contract "canceled" and terminated).

In 1981, Holly reported a cumulative net short-term capital loss of $349,468 from trading in forward contracts. The record is not clear as to the amount of the capital gain Holly reported in 1981 with respect to closing in 1981 the replacement contracts that Holly acquired in 1980.

On audit, insofar as is pertinent to the sole issue before us in the instant cases, respondent determined that Holly's claimed ordinary losses (relating to the forward contracts "canceled" and replaced and to the forward contracts "canceled" and terminated) should be treated as capital losses.

Discussion

The parties herein agree on two important points: (1) That the commodity forward contracts that Holly entered into and created with AGS constituted capital assets; and (2) that locking in, by offset -- at any point in time during the duration or length of forward contracts -- the gain or loss relating to the overall straddle transaction (or the gain or loss relating to a leg of the straddle transaction) constitutes the sale or exchange of a capital asset.

The issue in the instant cases is whether locking in -- at any point in time during the duration or length of a forward contract -- a loss relating to a leg of a straddle transaction by two methods slightly different from the offset method (namely, by cancellation and replacement and by cancellation and termination) also constitutes a sale or exchange of a capital asset, as respondent contends, or whether the taxpayers can convert the capital loss into an ordinary loss by the use of either of such two different methods, as petitioners contend.

As is often the case, critical to resolution of the issue before us is the statement of the issue. If the industry label and nomenclature are accepted at face value, and if the issue herein is stated simply in terms of whether "cancellation" of a leg of a forward contract gives rise to capital gain or loss, as distinguished from ordinary gain or loss, one is directed quickly to certain case authority (discussed below) that addresses tax

consequences of unexpected "cancellations" of commercial contracts, which cases generally turn on whether property rights relating to or arising out of the original contract survived the cancellation and whether all rights relating to the contract "vanished" with the cancellation.  As explained below, we believe such "cancellation" cases do not control the cancellation of commodity forward contracts by which investors simply settle or close out their position in a straddle or in a leg of a straddle transaction.

As stated, the parties agree that forward contracts in commodity markets held for investment constitute capital assets under section 1221.  Commissioner v. Covington, 120 F.2d 768 (5th Cir. 1941), affg. in part and revg. in part 42 B.T.A. 601 (1940); Vickers v. Commissioner, 80 T.C. 394 (1983); Hoover Co. v. Commissioner, 72 T.C. 206 (1979).  Although no delivery or physical exchange of the underlying commodity is contemplated, the monetary settlements that occur between the respective parties holding the contra positions in forward contracts have long been recognized to constitute "sales or exchanges" under the tax laws.

As we explained in Vickers v. Commissioner, supra at 409, involving futures contracts, for our purposes not significantly different from forward contracts --

> both the Supreme Court and the Congress have had occasions
> to deal with commodity futures transactions, have treated

them as capital transactions thus presupposing a "sale or exchange," and have never questioned our [Commissioner v.] Covington, [supra] or Battelle [v. Commissioner, 47 B.T.A. 117 (1942)] cases in which we found a "sale or exchange" in the "netting" or "offsetting" mechanism of the commodity exchanges. * * *

We went on in Vickers v. Commissioner, supra at 409, to explain further:

In the landmark Corn Products [Refining Co. v. Commissioner, 350 U.S. 46 (1955)] case in 1955, the Supreme Court even then was facing a consistent 20-year practice by respondent and the lower courts, whereby speculative transactions in commodity futures received capital treatment * * *. The Supreme Court cited our Battelle [v. Commissioner, supra,] case as part of that consistent practice. 350 U.S. at 53 n.8. Moreover, the Congress, too, has assumed that gains and losses from speculative commodity futures transactions are capital in nature as shown by the 1950 legislative history of the predecessor of section 1233 dealing with short sales of property and by the legislative history of the recent legislation dealing with commodity futures and eliminating certain abusive practices involving commodity tax straddles. [Fn. refs. omitted.]

In Commissioner v. Covington, supra at 769-770, an early opinion of the Court of Appeals for the Fifth Circuit, involving a taxpayer's losses from commodity futures contracts, the fundamentals of such transactions, from a tax standpoint, were explained, and it was concluded that such transactions in essence constitute sales or exchanges, as follows:

[The taxpayer argues that the investor] doesn't, by its dealing, become the owner of any property, it merely enters into executory contracts which are executed, not by transfer of property, but by closing them out at a profit or loss, under the rules of the exchange, without a sale or exchange of property being involved. * * * [T]he clearing house of

the exchange to which all contracts are transferred, extinguish[es] offsetting contracts and makes a money settlement of the price difference.  There is then neither the sale nor exchange of the commodity or of the contract.  <u>There is only the extinguishment of a contract to buy and a contract to sell, and a money settlement for the price difference</u>.  This, says the * * * [taxpayer], is not a selling or buying of property.  Speaking plainly [the taxpayer argues], it is simply an arrangement or device by which gains or losses are chalked up and settled for, between speculators who have taken opposite positions in a rising and falling market.

It is difficult to see how, if * * * [the taxpayer] is right in this naive reduction to fundamentals, of the transactions in which it has been engaged, its activities can be distinguished from mere wagering or to be equally naive, betting or gambling.  But they are so distinguished in law and in business contemplation, and they are so distinguished, because <u>implicit in the transactions is the agreement and understanding that actual purchases and sales,</u> and not mere wagering transactions, <u>are being carried on</u>.  [<u>Commissioner v. Covington</u>, 120 F.2d at 769-770; emphasis added.]

We believe the above statement from this early opinion is apropos to the facts of the transactions before us in this case and succinctly distills the essence of what is going on -- namely, the "purchase and sale" of forward contracts or "positions" in a particular market (in this case the market for interest-sensitive Government securities).  Whenever the investor (during the length or duration of the forward contracts that have been purchased) elects to settle, close out, extinguish, or cancel the contracts or positions, or one of the legs thereof, and to realize the gain or loss associated with the contracts, or with one of the legs thereof, and regardless of whether the

investor "closes out" or "locks in" the gain or loss by way of offset, by way of cancellation and replacement contracts, or by way of cancellation and termination, the transaction is exactly the same -- in purpose, in effect, and in substance -- and produces exactly the same type of taxable gain or loss -- in the instant cases capital gain or capital loss.

As the U.S. Court of Appeals for the Fifth Circuit stated, implicit in the realization or "lock in" of the gain or loss associated with straddle transactions or with legs thereof (whether the lock in is effected by way of offset, cancellation and replacement, or cancellation and termination) is the agreement and understanding that actual purchases and sales have occurred with respect to the price-differential and interest-sensitive risk for T-Bonds and GNMA's that each party accepted when the commodity straddle transaction was first entered into. In each case, the investor assumed the risk of swings in the price of such Government securities for whatever time each leg of the contract was outstanding.

Regardless of when and how a loss position in a commodity forward contract is extinguished, closed, settled, terminated, or canceled, at any one point in time during the length or duration of the contract, the investor in fact has participated in exactly the transaction for which the investor contracted from the time the transaction was first entered into until the day the investor chooses to close or terminate that leg.  The investor got exactly

what was bargained for (participation in this interest-sensitive risk transaction for a period of time) and when the investor closed the leg or the position (by whichever of the various "alternative liquidation techniques" that are made available to investors in commodities forward contracts (see Ewing v. Commissioner, 91 T.C. 396, 418 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991)), the investor effectively sold off or extinguished and exchanged that right to participate and realized the gain or loss associated therewith up to that point in time.

When the investor chooses to dispose of or terminate that risk, or any part thereof, and to lock in the gain or loss that has occurred on any leg of the straddle, because of swings in interest rates on Government securities that have occurred, the investor elects a method to do so, but each method produces exactly the same economic event and consequence, only nominal differences in form, and certainly, as between the parties to the forward contracts, a sale or exchange of the respective price-differential and interest-sensitive risk positions that their contracts represented from the time they first entered into the forward contracts up until the time that the risk is terminated and the gain or loss is locked in.

As we stated in Hoover Co. v. Commissioner, 72 T.C. 206, 249 (1979), in analyzing payments labeled as "compensating" payments

and in concluding that offsetting forward contracts in foreign

currency constituted capital transactions:

> These offsets clearly constitute both "closure" under
> section 1233 and a sufficient sale or exchange under the
> general capital provisions to mandate capital treatment
> here.  * * * [Id.]

As use of the term "compensate" was not controlling in

Hoover Co. v. Commissioner, 72 T.C. at 249, use of the term

"cancellation" by petitioners in connection with the settlement

of loss legs of their forward contracts is not controlling and

should not mislead us here.

Respectfully, we believe that the Court of Appeals for the

District of Columbia Circuit in Stoller v. Commissioner, 994 F.2d

855, 856-857, erred in not recognizing the above case authority

and holdings that establish the "closure" or "sale or exchange"

nature of the termination of offsetting forward contracts.  Upon

closing by offset of forward contracts, the transaction is

terminated and extinguished, settlement between the parties

occurs at that time, and no contracts remain in effect.  This is

illustrated clearly in Appendix A-1 hereto under the caption

"Straddles Opened And Closed -- 1980".  The four forward

contracts under this caption were opened on June 20, 1980, and

were settled and closed 10 days later on June 30, 1980, by four

offsetting forward contracts.  After June 20, 1980, in spite of

the fact that four offsetting forward contracts were entered into

with specified settlement dates in 1981 and 1982, the offsetting contracts extinguished each other.  The transactions were settled, terminated, and closed.  Nothing survived as between the parties to these particular forward contracts into 1981 and 1982.

Whether 6-months' offsetting forward contracts, all of the legs of an entire straddle, or simply one leg thereof, are settled or closed 1 week or 1 month after they are entered into, or not until the initially specified settlement date, and by whatever method used to settle or close the contracts (in the instant cases, by offset, by cancellation and replacement, and by cancellation and termination), in each situation the capital transaction that the parties entered into through the forward contracts, the straddle, and the legs thereof, has been closed and the payment received (if a gain is realized) or made (if a loss is realized) represents exactly the same type of income or loss earned with regard to the contracts, the straddle, or the legs thereof, for the length of time the forward contracts were outstanding.

Other legs of the straddle may remain open, and the parties may continue to be exposed to continuing shifts in interest rates and in price fluctuations of Government securities for the duration or length of time that other legs of the straddle remain open, but with regard to the leg that has been closed, or canceled, or offset, the transaction is closed, and a completed sale or exchange has occurred under section 1221 with regard to

the rights of the parties associated with that portion of the straddle that was closed.

With the benefit of further analysis, it is our conclusion that our opinion in Stoller v. Commissioner, T.C. Memo. 1990-659, affd. in part and revd. in part 994 F.2d 855 (D.C. Cir. 1993) (in its treatment of a cancellation and termination of a leg of a straddle transaction) and the opinion of the Court of Appeals for the District of Columbia Circuit in Stoller v. Commissioner (in its treatment of both cancellation and replacement and cancellation and termination of legs of straddle transactions) erred in not recognizing the fundamental sale or exchange nature of these transactions in which, simply stated, the gain or loss -- at a certain point in time -- is locked in with regard to the portion of the straddle that is closed.

As the Court of Appeals for the Fifth Circuit early recognized in Commissioner v. Covington, 120 F.2d at 769-770, "closing" of the contracts at a profit or loss is the sum and substance of the transactions before us.  We perceive no difference, for income tax purposes and in determining the character of the gain or loss, between closing a leg of a straddle and closing the entire straddle.  Both events lock in the gain or loss on the interest rate shift that has occurred as of the point in time that a leg or legs of the straddle are closed.

Courts often must address taxpayers' "artful devices" to convert ordinary gain into more favorable capital gain or to convert capital loss into more favorable ordinary loss. See Commissioner v. P.G. Lake, Inc., 356 U.S. 260, 265 (1958) (citing Corn Prods. Ref. Co. v. Commissioner, 350 U.S. 46, 52 (1955)). That task should be accomplished on the basis not of the "cancellation" label used by the parties but on the realities of the transactions and expectations of the parties.

We reiterate what we stated in Stoller v. Commissioner, supra, when presented with the identical facts as in the instant cases, that to call the closing transactions in issue "cancellations" is a misnomer and is misleading.

As stated earlier, we believe that cases involving unexpected and true cancellations of commercial contracts and "vanishing" or "disappearing assets" are not particularly helpful. See Leh v. Commissioner, 260 F.2d 489 (9th Cir. 1958), affg. 27 T.C. 892 (1957); Commissioner v. Pittston Co., 252 F.2d 344, 347-348 (2d Cir. 1958), revg. 26 T.C. 967 (1956); General Artists Corp. v. Commissioner, 205 F.2d 360, 361 (2d Cir. 1953), affg. 17 T.C. 1517 (1952); Commissioner v. Starr Bros., 204 F.2d 673, 674 (2d Cir. 1953), revg. 18 T.C. 149 (1952).

Those cases involve regular commercial contracts for the provision of goods or services and the unexpected cancellation of the contracts in midstream due to unusual circumstances not consistent with the continuation of the original contracts that

had been entered into. Leh v. Commissioner, supra (termination of petroleum supply contract); Commissioner v. Pittston Co., supra (termination of exclusive coal purchase contract); General Artists Corp. v. Commissioner, supra (cancellation of performance contract); Commissioner v. Starr Bros., supra (termination of exclusive pharmaceutical sales contract).

It seems obvious to us that the cancellations involved in the above cases are fundamentally different from the "cancellations" of forward contracts that are involved herein where the "cancellations", lock in, settlement, or closing that occurred are exactly what the parties contemplated when they entered into the forward contracts (namely, Holly and AGS contemplated that Holly would have the risk of price fluctuations on each leg of the straddle from the day the straddle was first opened until whatever day Holly chooses to lock in the gain or loss). Holly received the benefit of that contract and now becomes liable for the burden (namely, the loss incurred on the legs Holly chose to close). Holly received exactly what it contracted for. AGS did likewise. In this sense, the transactions in question with respect to the loss legs do not represent cancellations. They represent consummations. The cases, therefore, involving unexpected cancellations of commercial contracts are of limited applicability.

In a number of cases, taxpayers and respondent have sought to invoke the "disappearing asset" theory, but that theory was found to be inapplicable where a close scrutiny of the substance

and reality of the transaction in issue indicated that much more was involved than mere "vanishing assets."  In Commissioner v. Ferrer, 304 F.2d 125, 131 (2d Cir. 1962), revg. and remanding 35 T.C. 617 (1961), the cancellation of a contract entitling the taxpayer to produce the play "Moulin Rouge" (so that rights to produce the play could be transferred to another producer) was treated as a sale or exchange.

In Bisbee-Baldwin Corp. v. Tomlinson, 320 F.2d 929, 931-932 (5th Cir. 1963), a cancellation fee was treated as arising from a sale or exchange where, in substance, the underlying mortgage servicing contract was transferred to a third party.

That is the situation before us.  Particularly with regard to the loss legs that were "canceled" and immediately replaced, little, if anything, "vanished" upon Holly's closing or settling the loss legs.  To the contrary, Holly and the Holly partners stayed around, continued to participate in the straddle transactions, postponed even paying the loss until the very end of the year with funds borrowed by Holly, closed or settled the offsetting gain leg of the forward contracts just after the new year, and used the gain to repay the bank.  The last thing the investors would have wanted -- upon the "cancellations" in question -- is to vanish or disappear from the rest of these straddle transactions, the consequence of which is that the investors might actually have had a real loss to pay.

More than anything else, the investors wanted to stay around, to be a part of the straddle transactions as they came to their predictable, inevitable, intended, and planned closing. We agree with the analysis set forth in our prior opinion in Stoller v. Commissioner, 60 T.C.M. (CCH) at 1566, 1990 T.C.M. (P-H) at 90-3220 --

> the substance of the alleged cancellation transactions [will be determined] by looking to the entire spread arbitrage transaction and the economic consequences sought by the parties. * * * When * * * [the taxpayer] requested the cancellation of a contract or series of contracts, it was part of an ongoing straddle and was for the purpose of changing Holly's window of risk. He did not want to terminate Holly's straddle with AGS, he just wanted to change the delivery date of one leg and accelerate the loss to be recognized by Holly and its partners. * * * [Citation omitted.]

Respectfully, we also believe that in Stoller v. Commissioner, 994 F.2d at 858, the Court of Appeals for the District of Columbia Circuit erred in its interpretation of the 1981 legislative history accompanying the addition of section 1234A to the Internal Revenue Code. Id. The legislative history concerning section 1234A states the following:

### Present Law

> The definition of capital gains and losses in section 1222 requires that there be a "sale or exchange" of a capital asset. Court decisions have interpreted this requirement to mean that when a disposition is not a sale or exchange of a capital asset, for example, a lapse, cancellation, or abandonment, the disposition produces ordinary income or loss. * * * [See Leh v. Commissioner, 260 F.2d 489

(9th Cir. (1958) and <u>Commissioner v. Pittston Co.</u>, 252 F.2d 344 (2d Cir. 1958); fn. ref. omitted.]

<u>Reasons for Change</u>

The committee believes that the change in the sale or exchange rule is necessary to prevent tax-avoidance transactions designed to create fully-deductible ordinary losses on certain dispositions of capital assets, which if sold at a gain, would produce capital gains. * * *

Some taxpayers and tax shelter promoters have attempted to exploit court decisions holding that ordinary income or loss results from certain dispositions of property whose sale or exchange would produce capital gain or loss. * * *

*     *     *     *     *     *     *

Some of the more common of these tax-oriented ordinary loss and capital gain transactions involve cancellations of forward contracts for currency or securities.

The committee considers this ordinary loss treatment inappropriate if the transaction, such as settlement of a contract to deliver a capital asset, is economically equivalent to a sale or exchange of the contract. * * *  [S. Rept. 97-144, at 170-171 (1981), 1981-2 C.B. 412, 480.]

According to the Court of Appeals for the District of Columbia Circuit, the above language from the legislative history indicates that Congress thought that it was changing the law and that this change in the law is strong evidence that "cancellation" of commodity forward contracts before the change in the law produced ordinary losses.  <u>Stoller v. Commissioner</u>, 994 F.2d at 858.

We respectfully disagree with the Court of Appeals for the District of Columbia Circuit's analysis of the above legislative history.  See our explanation of the above legislative history in Stoller v. Commissioner, 60 T.C.M. (CCH) at 1565, with which we agree.  It suffices here to reiterate what we stated in Vickers v. Commissioner, 80 T.C. 394, 410-411 (1983) (in the context of commodity futures contracts), with regard to section 1234A:

> Whether new section 1234A is viewed as a change in the law in some areas or as merely removing all doubt that sales or exchange treatment is to be accorded to certain dispositions of property, we think Congress clearly did not intend to upset the sale or exchange treatment that had long been accorded to speculative commodity futures transactions of the type involved in the present case.  [Citation omitted.]

Petitioners argue that the proper venue for appeal of these cases is to the U.S. Court of Appeals for the District of Columbia Circuit and therefore that under Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we are bound to follow the opinion of the U.S. Court of Appeals for the District of Columbia Circuit in Stoller v. Commissioner, supra.

At the time the respective petitions in these cases were filed, however, petitioners resided as follows:

| Petitioners | Residence |
| --- | --- |
| Audrey H. Israel | New Jersey |
| Barry W. Gray, Executor representing the Estate of Leon Israel, Jr.* | New York |
| Jonathan P. and Margaret A. Wolff | New York |

\* Leon Israel, Jr., died a resident of New Jersey.

Petitioners' counsel argues that docket No. 31588-88, involving the Estate of Leon Israel, Jr., is appealable to the U.S. Court of Appeals for the District of Columbia Circuit because petitioners' counsel, Herbert Stoller, is also a co-executor of the Estate of Leon Israel, Jr., and resided in Bermuda at the time the petition was filed. In this regard, we note that the petition in docket No. 31588-88 was filed not by Herbert Stoller, as executor of the Estate of Leon Israel, Jr., but by Barry W. Gray, as executor of the Estate of Leon Israel, Jr.

Section 7482(b)(1)(A) provides that decisions of the Tax Court may be reviewed by the U.S. Court of Appeals for the circuit in which is located:

> (A) in the case of a petitioner seeking redetermination of tax liability other than a corporation, the legal residence of the petitioner,

Because Herbert Stoller is not a petitioner in docket No. 31588-88, it is unclear whether said docket would be appealable to the U.S. Courts of Appeals for the Second and/or Third Circuit or to the U.S. Court of Appeals for the District of Columbia Circuit. Accordingly, we are not bound by the opinion of the

U.S. Court of Appeals for the District of Columbia Circuit in
Stoller v. Commissioner, supra.

Decisions will be entered

under Rule 155.

Reviewed by the Court.

COHEN, CHABOT, JACOBS, GERBER, PARR, WELLS, RUWE, COLVIN, BEGHE, LARO, FOLEY, VASQUEZ, and GALE, JJ., agree with this majority opinion.

APPENDIX A-1

CHRONOLOGY OF HOLLY'S STRADDLE TRANSACTIONS

Explanation of Columns:

ACLIX # = ACLI Contract #  
Face = Face Value of Security  
Rate = Rate of Security  
O/C = Closed by Offset or Canceled  

Trade Date = Date Position Established  
L/S = Long or Short  
Price - Purchase or Sale Price  
Line Tr. Beg/Cl = Line # Transaction Begins or Closes  

Settlement Date = Delivery Date  
Scrty. = Government Security  
G/L Disp = Gain or Loss on Disposition When Position Closes  

Other Abbreviations:

MM = Millions of $  
CAN = Canceled  

GNMA = Ginnie Mae Certificate  

TBond = US Treasury Bond  

1979-1980 STRADDLE TRANSACTIONS

| ACLIX # | Line # | Trade Date | Settle Date | Face | L/S | Scrty. | Rate | Price | G/L | O/C | Line Tr. Beg/Cl |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 929772 | 1 | 10/12/79 | 9/16/81 | 3MM | L | GNMA | $77^{9}/_{32}$ | 2,318,437.50 | | O | 14 |
| 929773 | 2 | 10/12/79 | 3/18/81 | 3MM | S | GNMA | $77^{30}/_{32}$ | (2,338,125.00) | | O | 13 |
| 918904 | 3 | 10/12/79 | 3/81 | 3MM | L | TBond | $83^{11}/_{32}$ | 2,500,312.50 | | O | 16 |
| 918903 | 4 | 10/12/79 | 9/81 | 3MM | S | TBond | $83^{1}/_{32}$ | (2,490,937.50) | | O | 15 |
| 929768 | 5 | 10/12/79 | 9/16/81 | 5MM | L | GNMA | $77^{7}/_{32}$ | 3,860,937.50 | | C | 17 |
| 929770 | 6 | 10/12/79 | 3/18/81 | 5MM | S | GNMA | $77^{28}/_{32}$ | (3,893,750.00) | | O | 25 |
| 929769 | 7 | 10/12/79 | 9/16/81 | 5MM | L | GNMA | $77^{8}/_{32}$ | 3,862,500.00 | | C | 18 |
| 929771 | 8 | 10/12/79 | 3/18/81 | 5MM | S | GNMA | $77^{29}/_{32}$ | (3,895,312.50) | | O | 25 |
| 918907 | 9 | 10/12/79 | 3/81 | 5MM | L | TBond | $83^{12}/_{32}$ | 4,168,750.00 | | C | 19 |
| 918905 | 10 | 10/12/79 | 9/81 | 5MM | S | TBond | $83^{2}/_{32}$ | (4,153,125.00) | | O | 27 |
| 918908 | 11 | 10/12/79 | 3/81 | 5MM | L | TBond | $83^{11}/_{32}$ | 4,167,187.50 | | C | 20 |
| 918906 | 12 | 10/12/79 | 9/81 | 5MM | S | TBond | $83^{1}/_{32}$ | (4,151,562.50) | | O | 27 |
| 020094 | 13 | 10/23/79 | 3/18/81 | 3MM | L | GNMA | $73^{30}/_{32}$ | 2,218,125.00 | 120,000.00 | O | 2 |
| 020093 | 14 | 10/23/79 | 9/16/81 | 3MM | S | GNMA | $73^{17}/_{32}$ | (2,205,937.50) | (112,500.00) | O | 1 |
| 020053 | 15 | 10/23/79 | 9/81 | 3MM | L | TBond | $79^{16}/_{32}$ | 2,385,000.00 | 105,937.50 | O | 4 |
| 020052 | 16 | 10/23/79 | 3/81 | 3MM | S | TBond | $79^{20}/_{32}$ | (2,388,750.00) | (111,562.50) | O | 3 |
| CAN929768 | 17 | 10/24/79 | 9/16/81 | 5MM | L | GNMA | | | (200,000.00) | C | 5 |
| CAN929769 | 18 | 10/24/79 | 9/16/81 | 5MM | L | GNMA | | | (201,562.50) | C | 7 |
| CAN918907 | 19 | 10/24/79 | 3/81 | 5MM | L | TBond | | | (218,750.00) | C | 9 |
| CAN918908 | 20 | 10/24/79 | 3/81 | 5MM | L | TBond | | | (217,187.50) | C | 11 |
| 020073 | 21 | 10/24/79 | 6/17/81 | 5MM | L | GNMA | $73^{14}/_{32}$ | 3,671,875.00 | | O | 26 |
| 020074 | 22 | 10/24/79 | 6/17/81 | 5MM | L | GNMA | $73^{14}/_{32}$ | 3,671,875.00 | | O | 26 |
| 020050 | 23 | 10/24/79 | 6/81 | 5MM | L | TBond | $78^{30}/_{32}$ | 3,946,875.00 | | O | 28 |
| 020051 | 24 | 10/24/79 | 6/81 | 5MM | L | TBond | $78^{30}/_{32}$ | 3,946,875.00 | | O | 28 |
| 105623 | 25 | 1/23/80 | 3/18/81 | 10MM | L | GNMA | $77^{25}/_{32}$ | 7,778,125.00 | 10,937.50 | O | 6 & 8 |
| 105622 | 26 | 1/23/80 | 6/17/81 | 10MM | S | GNMA | $77^{21}/_{32}$ | (7,765,625.00) | 421,875.00 | O | 21 & 22 |
| 105625 | 27 | 1/23/80 | 9/1/81 | 10MM | L | TBond | $79^{13}/_{32}$ | 7,940,625.00 | 364,062.50 | O | 10 & 12 |
| 105624 | 28 | 1/23/80 | 6/1/81 | 10MM | S | TBond | $79^{15}/_{32}$ | (7,946,875.00) | 53,125.00 | O | 23 & 24 |

STRADDLES OPENED AND CLOSED -- 1980

| ACLIX # | Line # | Trade Date | Settle Date | Face | L/S | Scrty. | Rate | Price | G/L | O/C | Line Tr. Beg/Cl |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 147848 | 1 | 6/20/80 | 12/16/81 | 6MM | L | GNMA | $30^{10}/_{32}$ | 4,818,750.00 | | O | 6 |
| 147847 | 2 | 6/20/80 | 6/19/82 | 6MM | S | GNMA | $76^{26}/_{32}$ | (4,788,750.00) | | O | 5 |
| 147349 | 3 | 6/20/80 | 6/1/82 | 6MM | L | TBond | $83^{8}/_{32}$ | 4,995,000.00 | | O | 8 |
| 147350 | 4 | 6/20/80 | 12/1/81 | 6MM | S | TBond | $83^{20}/_{32}$ | (5,017,500.00) | | O | 7 |
| 150081 | 5 | 6/30/80 | 6/16/82 | 6MM | L | GNMA | $76^{5}/_{32}$ | 4,569,375.00 | 219,375.00 | O | 2 |
| 150082 | 6 | 6/30/80 | 12/16/81 | 6MM | S | GNMA | $76^{15}/_{32}$ | (4,588,125.00) | (230,625.00) | O | 1 |
| 150083 | 7 | 6/30/80 | 12/1/81 | 6MM | L | TBond | $79^{14}/_{32}$ | 4,766,250.00 | 251,250.00 | O | 4 |
| 150084 | 8 | 6/30/80 | 6/1/82 | 6MM | S | TBond | $79^{12}/_{32}$ | (4,762,500.00) | (232,500.00) | O | 3 |

APPENDIX A-2

## 1980-1982 STRADDLE TRANSACTIONS

| ACLIX # | Line # | Trade Date | Settle Date | Face | L/S | Scrty. | Rate | Price | G/L | O/C | Line Tr. Beg/Cl |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 164941 | 1 | 8/29/80 | 9/16/81 | 10MM | L | GNMA | $70^{6}/_{32}$ | 7,018,750.00 | | C | 8 |
| 164940 | 2 | 8/29/80 | 3/17/82 | 10MM | S | GNMA | $70^{6}/_{32}$ | (7,018,750.00) | | O | 21,22,31 |
| 164943 | 3 | 8/29/80 | 3/01/82 | 10MM | L | TBond | $72^{20}/_{32}$ | 7,262,500.00 | | C | 9 |
| 164942 | 4 | 8/29/80 | 9/18/81 | 10MM | S | TBond | $72^{10}/_{32}$ | (7,231,250.00) | | O | 27 & 28 |
| 178424 | 5 | 10/22/80 | 9/16/81 | 2.9MM | L | GNMA | $70^{23}/_{32}$ | 2,050,843.75 | | C | 7 |
| 178425 | 6 | 10/22/80 | 3/17/82 | 2.9MM | S | GNMA | $70^{22}/_{32}$ | (2,049,937.50) | | O | 31 |
| CAN178424 | 7 | 10/28/80 | 9/16/81 | 2.9MM | L | GNMA | | | (100,593.75) | C | 5 |
| CAN164941 | 8 | 10/28/80 | 9/16/81 | 10MM | L | GNMA | | | (293,750.00) | C | 1 |
| CAN164943 | 9 | 10/28/80 | 3/82 | 10MM | L | TBond | | | (421,875.00) | C | 3 |
| 180286 | 10 | 10/28/80 | 12/16/81 | 2.9MM | L | GNMA | $67^{8}/_{32}$ | 1,950,250.00 | | O | 24,25,26 |
| 180285 | 11 | 10/28/80 | 12/16/81 | 10MM | L | GNMA | $67^{8}/_{32}$ | 6,725,000.00 | | O | 24,25,26 |
| 180287 | 12 | 10/28/80 | 12/16/81 | 10MM | L | TBond | $68^{10}/_{32}$ | 6,831,250.00 | | O | 29 & 30 |
| 181467 | 13 | 11/05/80 | 12/80 | 1MM | L | TBond | 68 | 680,000.00 | | C | 17 |
| 181466 | 14 | 11/05/80 | 3/81 | 1MM | S | TBond | $68^{20}/_{32}$ | (686,250.00) | | C | 18 |
| 182250 | 15 | 11/07/80 | 12/80 | 1MM | L | TBond | 67 | 670,000.00 | | C | 19 |
| 182251 | 16 | 11/07/80 | 3/81 | 1MM | S | TBond | $67^{20}/_{32}$ | (676,250.00) | | C | 20 |
| CAN181467 | 17 | 11/25/80 | 12/80 | 1MM | L | TBond | | | 10,000.00 | C | 13 |
| CAN181466 | 18 | 11/25/80 | 3/81 | 1MM | S | TBond | | | (15,000.00) | C | 14 |
| CAN182250 | 19 | 11/25/80 | 12/80 | 1MM | L | TBond | | | 20,000.00 | C | 15 |
| CAN182281 | 20 | 11/25/80 | 3/81 | 1MM | S | TBond | | | (25,000.00) | C | 16 |
| 390801 | 21 | 9/18/81 | 3/17/82 | 2.5MM | L | GNMA | $58^{1}/_{32}$ | 1,450,781.25 | | O | 2 |
| 390800 | 22 | 9/18/81 | 3/17/82 | .9MM | L | GNMA | 58 | 522,000.00 | 413,593.75[1] | O | 2 |
| 390799 | 23 | 9/18/81 | 6/16/82 | 9.5MM | L | GNMA | $53^{2}/_{32}$ | 5,515,937.50 | | O | 32 |
| 390802 | 24 | 9/18/81 | 12/16/81 | 5.6MM | S | GNMA | $57^{25}/_{32}$ | (3,235,750.00) | | O | 10 & 11 |
| 390803 | 25 | 9/18/81 | 12/16/81 | 2.4MM | S | GNMA | $57^{26}/_{32}$ | (1,387,500.00) | | O | 10 & 11 |
| 390804 | 26 | 9/18/81 | 12/16/81 | 4.9MM | S | GNMA | $57^{27}/_{32}$ | (2,834,343.75) | (1,217,656.25)[2] | O | 10 & 11 |
| 390805 | 27 | 9/18/81 | 9/18/81 | 5.1MM | L | TBond | 59 | 3,009,000.00 | | O | 4 |
| 390806 | 28 | 9/18/81 | 9/18/81 | 4.9MM | L | TBond | $58^{24}/_{32}$ | 2,878,750.00 | 1,343,500.00[3] | O | 4 |
| 390808 | 29 | 9/18/81 | 12/1/81 | 4.9MM | S | TBond | $59^{11}/_{32}$ | (2,907,843.75) | | O | 12 |

34

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 391075 | 30 | 9/18/81 | 12/1/81 | 5.1MM | S | TBond | $59^{16}/_{32}$ | (3,034,500.00) | (888,906.25)[4] | O | 12 |
| 436789 | 31 | 3/4/82 | 3/17/82 | 9.5MM | L | GNMA | $63^{5}/_{32}$ | 5,999,843.75 | <u>682,468.75</u>[5] | O | 2 & 6 |
| 436790 | 32 | 3/4/82 | 6/16/82 | 9.5MM | S | GNMA | $62^{13}/_{32}$ | (5,928,593.75) | 412,656.25 | O | 23 |

[1] Gain figure represents gain realized by offsetting $3.4 million of Contract # 164940 (line 2) by lines 21 and 22.

[2] Loss figure represents total loss realized on closing transactions on lines 10 and 11 by transactions shown on lines 24 through 26.

[3] Gain figure represents total gain realized by offsetting transaction shown on line 4 by transactions shown on lines 27 and 28.

[4] Loss figure represents total loss realized by offsetting transaction shown on line 12 by transactions shown on lines 29 and 30.

[5] Gain figure represents gain realized by offsetting $6.6 million of Contract # 164940 (line 2) and line 6 by line 31.

BEGHE, <u>J</u>., concurring:  Having joined the majority opinion, I write separately to respond to some of the strictures in the dissenting opinion.

With all due respect, the author of the dissenting opinion and the Court of Appeals for the District Columbia Circuit in <u>Stoller v. Commissioner</u>, 994 F.2d 855 (D.C. Cir. 1993), revg. in part T.C. Memo. 1990-659, have not paid proper heed to the body of judge-made law in the Second and Third Circuits, as well as this Court, that treats even true cancellations of some types of contracts as capital gain or loss transactions; this is just another area in which the capital character of the asset and other circumstances properly focus the analysis upon the nature of the contract rights in question, rather than merely upon the structure of the transaction as a "sale or exchange", as opposed to a cancellation, termination, or relinquishment.  See, e.g., <u>Commissioner v. Ferrer</u>, 304 F.2d 125 (2d Cir. 1962), revg. in part and remanding 35 T.C. 617 (1961); <u>Commissioner v. McCue Bros. & Drummond, Inc.</u>, 210 F.2d 752 (2d Cir. 1954), affg. 19 T.C. 667 (1953); <u>Commissioner v. Golonsky</u>, 200 F.2d 72 (3d Cir. 1952), affg. 16 T.C. 1450 (1951); see also <u>Sirbo Holdings, Inc. v. Commissioner</u>, 509 F.2d 1220 (2d Cir. 1975), affg. 61 T.C. 723 (1974); <u>Maryland Coal & Coke Co. v. McGinnes</u>, 225 F. Supp. 854 (E.D. Pa. 1964), affd. 350 F.2d 293 (3d Cir. 1965).

Other special circumstances present in the cases at hand provide a principled basis for looking beyond the conceded facts

that the transactions in question were bona fide, had economic substance, and were entered into for profit--all of which only go to the economics of the amount of gain or loss--to recognize the also inescapable facts that Holly and AGS were related parties with no adverse interests insofar as the treatment of the closing transactions as offsets or cancellations was concerned. The custom or usage of the trade among dealers and traders in forward contracts and the underlying commodities, which Holly and AGS arbitrarily ignored, is that true cancellations are only employed to correct mistakes, not to close out forward contracts entered into and disposed of in the ordinary course of business.[1] See Brown v. Commissioner, 85 T.C. 968, 994 (1985), affd. sub nom. Sochin v. Commissioner, 843 F.2d 351 (9th Cir. 1998); Stoller v. Commissioner, T.C. Memo. 1990-659, 60 T.C.M. (CCH) 1554, 1566, 1990 T.C.M. (P-H) par. 90,659, at 3220-90; majority op. p. 10.

---

[1]Another fact, shown in the stipulated record, that points up the arbitrary treatment of the transactions between Holly and AGS, insofar as the choice of tax consequences was concerned, is that, in the case of offsetting transactions, Holly and AGS agreed to recognize both gains and losses as of the trade date of the offset. This would seem to be contradicted by the fact that both contracts remain in existence, and a net profit or loss is locked in, but remains unrealized until the settlement date when the securities are deemed delivered and received pursuant to both contracts, and the net profit or loss debited or credited to the trader's account. I don't understand how agreement of the parties could change the tax consequences. If such an agreement were efficacious, the validity of short sales against the box in not only locking in gain but also postponing realization would seem to be thrown into doubt.

In these circumstances, the analysis in the majority opinion of the forward contracts in question and the ways in which they were handled by Holly and AGS is consistent with and supported by Judge Friendly's analysis in Commissioner v. Ferrer, supra, and its ancestors and descendants. The cases at hand, then, are the latest ones in which it is appropriate to observe that "the 'formalistic distinction' between two-party and three-party transactions that was criticized in Ferrer is fast becoming a footnote to history." Bittker & McMahon, Federal Income Taxation of Individuals par. 32.1[5] at 32-5, 6 (1995).

CHABOT, JACOBS, and PARR, JJ., agree with this concurring opinion.

HALPERN, <u>J.</u>, dissenting:

I. <u>Introduction</u>

I dissent because I believe that the majority is not justified in disregarding the actual transactions engaged in by Holly (the partnership) in favor of hypothetical transactions that yield the largest tax for the Government. The majority justifies treating a cancellation as a sale on the ground that cancellations and offsets are economically equivalent. Even were I to accept that proposition, the majority has failed to persuade me that a common "reality" of the two transactions is a sale. In searching for that reality, it is important to keep in mind that respondent has made the following concession:

> Respondent concedes for purposes of these cases that Holly Trading Associates' transactions in forward contracts with ACLI Government Securities, Inc. during the years at issue were <u>bona fide</u>, <u>had economic substance</u>, and <u>were entered into for profit</u>. [Emphasis added.]

I cannot join in an opinion that taxes a cancellation as a sale without specific statutory authority and under what I consider a drastic extension of the doctrine of substance over form.

II. <u>Anticipatory Commodities Transactions</u>

I believe that, in part, the majority misunderstands some of the complex arrangements by which persons arrange for the future purchase or sale of a commodity. A certain amount of detail is necessary to appreciate what I believe the majority misunderstands. Many of the factual details of the various

anticipatory arrangements for the purchase or sale of a commodity can be found in our opinion in Stoller v. Commissioner, T.C. Memo. 1990-659, affd. in part and revd. in part 994 F.2d 855 (D.C. Cir. 1993).[1]  Following are pertinent terms and concepts.

A.  Regulated Futures Contracts

A regulated futures contract (RFC) is a standardized executory contract to buy or sell a designated commodity at a specific price on a fixed date in accordance with the rules of a commodity exchange.  The date the contract is to be performed is normally identified by its delivery month, e.g., "a January 1997 contract".  All RFCs start out as a contract between a buyer and seller.  At the end of each trading day, the exchange's clearing organization substitutes itself as the "other side" of each contract, so the clearing organization becomes the buyer to each seller and the seller to each buyer.  The agreement made by or on behalf of the two parties on the floor of the exchange is thus broken down into a "long" RFC, in which one party is the buyer and the clearing organization is the seller, and a "short" RFC,

---

[1]  My research has also led me to two helpful articles dealing with both the mechanical and tax aspects of anticipatory commodities transactions, at least as those matters stood in 1981, which is about the date of the transactions involved herein.  Donald Schapiro, Commodities, Forwards, Puts and Calls-- Things Equal to the Same Things Are Sometimes Not Equal to Each Other, 34 Tax Lawyer 581 (1980-81); Donald Schapiro, Tax Aspects of Commodity Futures Transactions, Forward Contracts and Puts and Calls, 39th Annual N.Y.U. Institute 16-1 (1981).

in which the other party is the seller and the clearing organization is the buyer.

Trading in RFCs for a specific commodity and delivery month continues until the day of the month set by the exchange on which trading in contracts for that delivery month stops. Thereafter, delivery of the commodity is made by holders of open short RFCs to holders of open long RFCs on the matched-up basis established by the clearing organization.

Up until the date trading stops, the holders of both long and short RFCs can close out their contracts without making or taking delivery of the commodity by entering into inverse purchase or sale contracts on the exchange. Thus, the holder of a long RFC can eliminate the risk of, or "offset", his obligation to purchase and pay for the commodity by acquiring from another the promise to purchase and pay for the same commodity on the same exchange for the same delivery month, that is, by entering into an inverse, short RFC. Such a transaction has been held to meet the Code requirement of a "sale or exchange", which can give rise to capital gain or loss, on the ground that a "fictional" delivery is made on the offsetting inverse, short RFC with the commodity "acquired" under the long RFC. Commissioner v. Covington, 120 F.2d 768, 770, 772 (5th Cir. 1941), affg. in part and revg. in part 42 B.T.A. 601 (1940). The holder of a short RFC can, likewise, offset his obligation to sell the commodity at the agreed price by acquiring from another a commitment to sell

and deliver the same commodity on the same exchange for the same delivery month, that is, by entering into an inverse, long RFC. The commodity to be delivered under the long RFC is deemed received and used to satisfy the delivery obligation under the short RFC, thus satisfying the sale or exchange requirement necessary for capital gain or loss treatment.  Id.  The special short sale rules of section 1233 are applicable to RFCs.  Unless certain exceptions apply, the gain or loss is capital.  Sec. 1233(a).

It appears that, under the usual exchange rules applicable to RFCs, the offsetting contracts, which are both with the exchange, immediately cancel and are terminated, with a money settlement for the difference in value.  Commissioner v. Covington, supra at 769.  Gain or loss is, thus, realized on that (the offset) date.

B.  Forward Contracts

A forward contract is also an executory agreement calling for future delivery of a commodity.  Forward contracts, however, are privately negotiated; they are not traded on commodity exchanges or subject to the rules of any board of trade.  If the parties to any particular forward contract agree, the contract can be canceled before the delivery date.  Normally, any unrealized gain or loss in the contract would then be accounted for because the party on the profitable end of the contract would demand payment for giving up a valuable right.  The character of that gain or loss is the question in this case.  A party may fix the amount of

unrealized gain or loss in a forward contract by entering into an inverse contract to buy or sell the same commodity for delivery on the same date (the settlement date), but at the then current market price for delivery on such date.  In Hoover Co. v. Commissioner, 72 T.C. 206, 249-250 (1979), we described the consequence of entering into offsetting forward contracts.

> Finally, we note that the most common method of settling a forward sale contract has traditionally been to enter into a purchase contract and to offset the contractual obligations to sell and purchase.  Meade v. Commissioner, T.C. Memo. 1973-46; Muldrow v. Commissioner, 38 T.C. 907, 910 (1962); Sicanoff Vegetable Oil Corp. v. Commissioner, 27 T.C. 1056, 1059, 1063 (1957), revd. 251 F.2d 764 (7th Cir. 1958). Offset of the contractual obligations by the seller has been held to be delivery under the sale contract (Chicago Bd. of Trade v. Christie Grain & Stock Co.,  198 U.S. 236, 248 (1905); Lyons Milling Co. v. Goffe & Carkener, Inc., 46 F.2d 241, 247 (10th Cir. 1931)),  satisfying the sale or exchange requirement on the date the contract is settled.  See Covington v. Commissioner, 42 B.T.A. 601 (1940), affd. in part   120 F.2d 768 (5th Cir. 1941), cert. denied 315 U.S. 822 (1942).

There is, thus, an important distinction between the operation of offset in the contexts of RFCs and forward contracts.  By exchange rules, offsetting RFCs cancel and are terminated on the offset date, with a money settlement then for any difference in values.  Offsetting forward contracts, being privately negotiated, do not automatically cancel and terminate on the offset date but, unless the parties agree to the contrary, coexist until the settlement date, when both contracts are deemed to have been executed, with delivery taken (on the long contract) and delivery made (on the short contract).  Although not perfectly clear on that point, Hoover suggests that, unless the

parties earlier agree to settle up, the settlement date, not the offset date, is the date that gains and losses are realized with respect to forward contracts settled by offset. In <u>Hoover</u>, there were 13 forward contracts in issue that were settled by entering into inverse forward contracts. Of that number, a debit or credit (settlement payment) was made after the offset date, on the settlement date, in nine situations. In one situation, a settlement payment was made after the offset date, but in advance of the settlement date, and, in one situation, a settlement payment was made after the settlement date. In two situations, a settlement payment was made on the offset date. In one situation, it is clear that the settlement payment was made in a year beginning after the offset date. Nothing indicates that the taxpayer did not report, and both the Commissioner and the Court accepted, the date of the settlement payment as the date that gain or loss was realized. Indeed, the Court calculated the holding period with respect to those transactions from the offset date; those calculations seem to belie any assertion that the offset date is the date of realization. <u>Hoover Co. v. Commissioner</u>, <u>supra</u> at 250-251.

C. <u>Straddle</u>

A person who has entered into either a RFC or a forward contract (when no distinction is intended, an "anticipatory contract") assumes the risk that the market price for delivery of the commodity on the agreed date will change. Changes in the

market price for delivery of the commodity will result in changes in the value of an anticipatory contract for delivery in that month.  An anticipatory contract holder is described as being in a "naked" position when he bears the unalloyed risk of changes in the market price for delivery of the commodity (market risk).

A "straddle", in its simplest terms, is the simultaneous entry into two anticipatory contracts with respect to the same commodity; one is a long contract, to buy a given amount of the commodity for delivery at a specific time, and the other is a short contract, to sell the same amount of the commodity for delivery at a different time.  A straddle reduces market risk because, as the value of one leg decreases, the value of the other leg increases.  Because the legs are for deliveries at different times, the value changes will not necessarily be exactly offsetting.  There is, thus, the potential for profit or loss in a straddle.

D.  Replacing a Leg

A participant in a straddle may replace one leg of the straddle with another contract of the same kind (i.e., long or short) for a different delivery date (such replacement of one leg being referred to as a switch).  For example, here, in Stoller v. Commissioner, T.C. Memo. 1990-659, with respect to the cancellations in question (except for one group, the November 25th group), we found that the partnership wished to

change delivery dates in order to shorten the window of risk of the straddle.

In the case of a straddle built on RFCs, the mechanics of a switch would involve the taxpayer simultaneously entering into (1) an inverse contract with respect to the long or short RFC being switched and (2) a like (long or short) RFC to replace the RFC being switched.  Except perhaps in the case of certain tax-motivated straddles, see, e.g., Smith v. Commissioner, 78 T.C. 350 (1982), gain or loss on the long RFC component of the offsetting pair would immediately be realized and recognized. Commissioner v. Covington, 120 F.2d 768 (5th Cir. 1941).  In the case of a straddle built on forward contracts, the parties to the contract to be switched may agree to cancel that contract, settling up with respect to any gain or loss in the contract.  To avoid being naked with respect to the remaining leg of the straddle, the straddling party would immediately enter into a contract to replace the canceled contract and complete the switch.  The character of any gain or loss to be accounted for on the cancellation is the issue in this case, but there seems to be no disagreement that cancellation is an event giving rise to an allowable loss.  In the case of a switch made by first entering into an inverse contract with the same party, the suggestion of Hoover Co. v. Commissioner, 72 T.C. 206 (1979), is that gain or loss is realized upon the hypothetical delivery under the short

contract of the offsetting pair on the settlement date or on any earlier date that the parties consummate a cash settlement. That suggestion as to timing, however, is thrown into doubt by the majority. There seems to be no disagreement, however, that the gain or loss is realized from a sale or exchange. The second step in the switch would be exactly the same as if the switch were initiated by canceling the to-be-switched-leg, i.e., entering into a replacement contract.

E. Canceling Both Legs

The majority has not made clear that what it has called the Third Contract, see majority op. p. 5 (the November 25th group), involved straddles consisting of contracts that were all closed by cancellation on the same date. There was no switch of any leg and, consequently, no continuing straddle investment after the cancellations, all of which took place on November 25, 1980.

III. Majority's Theory of Equivalence

I believe that the key to understanding the majority's error is contained in the following sentence:

Whenever the investor (during the length or duration of the forward contracts that have been purchased) elects to settle, close out, extinguish, or cancel the contracts or positions, or one of the legs thereof, and to realize the gain or loss associated with the contracts, or with one of the legs thereof, and regardless of whether the investor "closes out" or "locks in" the gain or loss by way of offset, by way of cancellation and replacement contracts, or by way of cancellation and termination, the transaction is exactly the same -- in purpose, in effect, and in substance -- and produces exactly the same type of taxable gain or loss -- in the instant cases capital gain or capital loss. [Majority op. pp. 18-19; emphasis added.]

That sentence follows almost immediately after the majority's citation to, and quotation from, Commissioner v. Covington, supra. The majority emphasizes those parts of the court's opinion (1) describing the taxpayer's argument that, pursuant to exchange rules, offsetting RFCs are extinguished and a money settlement made and (2) finding that implicit in an exchange regulated offset is the "agreement and understanding" that an actual purchase and sale of the underlying commodity has taken place. Majority op. p. 19. The majority finds that the agreement and understanding implicit in the exchange rules governing offsets of RFCs is apropos to the cancellations of the forward contracts here in issue. Id.

The majority states:

> Courts often must address taxpayers' "artful devices" to convert ordinary gain into more favorable capital gain or to convert capital loss into more favorable ordinary loss. * * * That task should be accomplished on the basis not of the "cancellation" label used by the parties but on the realities of the transactions and expectations of the parties. [Majority op. pp. 24; emphasis added.]

The majority obviously concludes that the common reality of (1) exchange regulated offsets, (2) the bilateral relationship of the two parties to offsetting forward contracts, and (3) the terminated relationship of the parties to a canceled forward contract is a sale or exchange. Indeed, the majority states that, in Stoller v. Commissioner, T.C. Memo. 1990-659, affd. in part and revd. in part 994 F.2d 855 (D.C. Cir. 1993), both this Court and the Court of Appeals for the District of Columbia

Circuit erred in not recognizing "the fundamental sale or exchange nature" of cancellations of forward contracts. Majority op. p. 22.

The majority's perception of fundamental reality is bottomed on the treatment accorded RFCs settled by offset, as articulated in Covington v. Commissioner, supra. There, the taxpayer argued that the reality of an exchange regulated offset is the lack of any actual sale or exchange because there is an extinguishment of the RFC settled by offset. The Court of Appeals for the Fifth Circuit, however, forced the taxpayer to abide by the form of the transaction he had chosen (as sculpted by the exchange rules dealing with offsets) and held that, in effect, he had entered into two contracts and realized a gain on closing the short contract. That is a perfectly appropriate result. See, e.g., Legg v. Commissioner, 57 T.C. 164, 169 (1971), affd. 496 F.2d 1179 (9th Cir. 1974), in which we stated: "A taxpayer cannot elect a specific course of action and then when finding himself in an adverse situation extricate himself by applying the age-old theory of substance over form."

The fiction imposed on a taxpayer that settles RFCs by offset, however, is not a ground to conclude that, in reality, a taxpayer not engaging in an exchange regulated offset (indeed, not engaging in an offset at all) entered into a hypothetical contract to complete the purchase and sale of a commodity that he never owned. Assume, for instance, that the taxpayer has

constructed a straddle in X commodity, entering into a long May forward contract and a short September forward contract. Assume further that there is an unrealized loss in the short contract, and, for legitimate business reasons, the taxpayer wishes to switch the short contract to a December forward contract. The taxpayer cancels the short September contract, makes a cash settlement payment, and enters into a short December contract. The reality that the majority would impose is that the taxpayer entered into a long September contract under which, hypothetically, he took delivery of the commodity, which was used to satisfy the short September contract. To me, that is not reality; it is a fiction built upon a fiction.

As a matter of tax policy, perhaps the cancellation of a forward contract should be treated as a zero dollar sale so as to satisfy the sale or exchange requirement of section 1222. Congress thinks so and has added section 1234A, which, however, is not effective with respect to the facts of this case.

The majority's understanding of the "nature of the termination of offsetting forward contracts", majority op. p. 20, is illustrated by certain forward contracts in this case. That perspective is set forth as follows: "Upon closing by offset of forward contracts, the transaction is terminated and extinguished, settlement between the parties occurs at that time, and no contracts remain in effect." Id. If that is intended as a general statement of fact or of legal consequence, it is

unsupported by any authority and is in apparent contradiction to our findings and opinion in Hoover Co. v. Commissioner, 72 T.C. 206 (1979). Certainly, it is in contradiction to the understanding of the facts in this case by the Court of Appeals for the District of Columbia Circuit. In reversing us in part, the court said:

> The problem with the Tax Court's reasoning is that cancellation and offset are different in substance as well as in form. When a contract is cancelled it simply ceases to exist. When a contract is offset, both the original contract and the offsetting contract remain in effect until the date for delivery. * * * [Stoller v. Commissioner, 994 F.2d at 857-858; emphasis added.]

The majority may be misled by the way the partnership accounted for offset transactions. It appears that the partnership accounted for unrealized gains and losses in forward contracts as of the offset date, the date of the inverse contract. That may or may not have been correct, but it is not evidence that the contracts were, by agreement, terminated on the offset date. More to the point, it is not evidence of general industry practice.

In addition, the majority suggests that, since "little, if anything, `vanished' upon Holly's closing or settling the loss legs", sale or exchange treatment of those contract cancellations is appropriate. Majority op. p. 25. The majority recognizes that some contracts were not replaced (the November 25th group). Nevertheless, the majority explains that what remained after the contract cancellations was Holly's continued participation in

straddle transactions: "The last thing the investors would have wanted -- upon the `cancellations' in question -- is to vanish or disappear from the rest of these straddle transactions, the consequence of which is that the investors might actually have had a real loss to pay." Id.

By juxtaposing cases involving "unexpected and true cancellations" of "regular commercial contracts for the provision of goods or services" (true cancellations) with the forward contract cancellations in issue, the majority purports to discern a fundamental difference that distinguishes true cancellations and explains the capital loss treatment appropriate for the contracts in issue. Id. at 23-24. The majority rejects true cancellation treatment for the contracts in issue by invoking what it considers Judge Friendly's "substance and reality" analysis in Commissioner v. Ferrer, 304 F.2d 125 (2d Cir. 1962), revg. and remanding 35 T.C. 617 (1961). Believing that the "situation" here is the same as in the Ferrer case, the majority slaps together the whole of the partnership's straddle activities into a unitary endeavor that justifies disregarding (partially) each individual step.

I believe that the majority has failed to appreciate the significance of Judge Friendly's analysis in the Ferrer case and, therefore, may not seek its blessing. In that case, involving the purported termination of certain dramatic production contract rights, Judge Friendly stated:

> Tax law is concerned with the substance, here the voluntary passing of "property" rights allegedly constituting "capital assets," not with whether they are passed to a stranger or to a person already having a larger "estate." So we turn to an analysis of what rights Ferrer conveyed. [Id. at 131.]

Judge Friendly then engaged in an examination of the nature of the various rights in issue in that case. He believed that the principal distinction between a termination of contract rights that gives rise to capital gain and a termination that does not is the existence of an "equitable interest" in the holder of the rights being terminated, which interest is evidenced by the availability of equitable relief in the enforcement of the contract rights. Id. at 131-134.[2] It is, thus, insufficient for the majority to consider all of the partnership's straddle investments, each straddle transaction, or even each forward contract and to pronounce baldly that the partnership "received exactly what it contracted for." Majority op. p. 25. Nor is it sufficient to rely on the parties' stipulation that the forward contracts in issue constitute capital assets. What is required is a careful consideration of the partnership's property interests in the subject matter of the contracts in question, in light of Congress' admittedly indistinct purpose in providing for

---

[2]     That understanding of Judge Friendly's analysis has been stated by two commentators:  Marvin A. Chirelstein, Capital Gain and the Sale of a Business Opportunity: The Income Tax Treatment of Contract Termination Payments, 49 Minn. L. Rev. 1, 20-23 (1964); James S. Eustice, Contract Rights, Capital Gain, and Assignment of Income--the Ferrer Case, 20 Tax L. Rev. 1, 7-9 (1964).

the exceptional treatment of capital gains and losses.  In sum, the majority has failed to examine the nature of the contract rights terminated by the cancellations of the forward contracts in issue in the manner contemplated by Judge Friendly and, therefore, is foreclosed from relying on Commissioner v. Ferrer, supra, to support its substance and reality analysis.

  Another difficulty with the rationale of the majority is the majority's failure to explain the steps by which it proceeded to conclude that the cancellation losses were losses from the sale or exchange of capital assets.  Section 1001 addresses the determination of gains and losses on the disposition of property.  The sale or exchange requirement for capital gain or loss treatment is introduced in section 1222.  The majority has failed to explain exactly what property was disposed of when a forward contract was canceled, how the partnership's adjusted basis in the disposed-of property was determined, or what amount was realized on such disposition.  I must admit that I am puzzled by those questions, as I am puzzled by how Judge Friendly's "equitable interest" analysis could be applied to find a capital loss in a situation where the last thing the partnership intended was actual delivery of the underlying securities that were the subject of the forward contracts in question.  Given Congress' enactment of section 1234A, I see no reason to engage in an analysis that may result in consequences we cannot foresee.

IV.  <u>Conclusion</u>

Professors Bittker and Lokken, in their treatise on Federal income, gift, and estate taxation, address the principle that substance must govern over form in taxation.  Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 4.3.3, at 4-33, (2d ed. 1989).  They begin their discussion by noting that the substance-over-form principle has been referred to as "the cornerstone of sound taxation" (quoting <u>Estate of Weinert v. Commissioner</u>, 294 F.2d 750, 755 (5th Cir. 1961), revg. and remanding 31 T.C. 918 (1959)).  <u>Id.</u>  In the course of their discussion, they state (without citation of authority, but none is needed):  "If a transaction is consummated in a form that fairly reflects its substance, it ordinarily passes muster despite the conscious pursuit of tax benefits; in this case, the choice of form resembles an election provided by statute."  <u>Id.</u> at 4-38.  They caution, however:

> A rogue offshoot of the substance-over-form doctrine suggests that when a taxpayer selects one of several forms that have identical practical consequences in the real world, the government can disregard the chosen form and tax the transaction as though the most costly of the alternatives had been employed.  * * *  [<u>Id.</u> at 4-41.]

They continue:  "On close inspection, the most-costly-alternative theory turns out to be a drastic extension, rather than a mere restatement, of the substance-over-form doctrine."  <u>Id.</u> at 4-42.

The majority has not invoked much of the substance-over-form jurisprudence.  It has, however, looked for the "realities of the

transactions" and raised the specter of "artful devices". I believe that it is fair to say that the majority has looked to tax the cancellation transactions on the basis of what it considers to be their substance. In searching for that substance, however, the majority has dug no deeper than the fiction that accounts for the tax treatment of exchange regulated offsets and forward contracts settled by offset and payment. Indeed, with respect to offsetting forward contracts, the majority appears to conclude, wrongly, that all such contracts cease to exist on the offset date. The reality of the settlement of anticipatory contracts by offset is not that the contract holder took delivery under a long contract of a commodity that he then used to satisfy his delivery obligation under a short contract. That is a fiction imposed on the taxpayer because of the way <u>he</u> chose to cast his transaction. To impose that fiction on a taxpayer who, for whatever reason, chose <u>not</u> to cast his transaction that way seems to me to be wrong, at least without some better explanation than what the majority gives. From a policy perspective, I can sympathize with the majority's concern that a taxpayer should not be able to lower his tax bill simply on the basis of which form, as between two economically equivalent (or similar) forms, he chooses. The majority's concern is apparent in how, in part, it frames the issue in this case: "whether the taxpayers can convert <u>the capital loss</u> into an ordinary loss". Majority op. p. 14 (emphasis added). That

statement suggests that the proper inquiry is the proper tax characterization of the cancellations, not whether, tax questions aside, form and substance agree.  To me, that is a troublesome inquiry for the reasons stated by Professors Bittker and Lokken.